**2015-1286**

In The
# United States Court Of Appeals
# For The Federal Circuit

## AIP ACQUISITION LLC,

*Appellant,*

v.

## LEVEL 3 COMMUNICATIONS, LLC,

*Appellee.*

**ON APPEAL FROM THE PATENT AND TRADEMARK OFFICE,
PATENT TRIAL AND APPEAL BOARD
IN SERIAL NO. IPR2013-00296**

_____

### BRIEF OF APPELLANT

_____

Chi Eng
(chi@englawfirm.com)
ENG LAW FIRM
Newark Gateway Center
One Gateway Center, Suite 2600
Newark, NJ 07102
(646) 770-2347

*Dated: March 24, 2015*                    *Counsel for Appellant*

# CERTIFICATE OF INTEREST

Pursuant to Federal Rule of Appellate Procedure 26.1 and Federal Circuit

Rule 47.4, the undersigned counsel for Requester-Appellant AIP Acquisition LLC

hereby certifies that:

1.     The full names of every party or amicus represented by me is:

   AIP ACQUISITION LLC

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   None.

3.     The parent companies, subsidiaries (except wholly-owned subsidiaries), and affiliates that have issued shares to the public, of the party or amicus represented by me are:

   None.

4.     The names of all law firms and the partners and associates that appeared for any of the parties represented by me in the Patent and Trademark Office or are expected to appear in this Court are:

   John Philips, Robert DeVoto, Karl Renner, Jason Wolffe, and Dan Smith of Fish & Richardson appeared before the Patent Trial Appeal Board in the Patent and Trademark Office below.

# TABLE OF CONTENTS

**Page:**

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES .....................................................................v

GLOSSARY ........................................................................................ vii

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES...............................................................2

STATEMENT OF THE CASE...................................................................3

    A. Procedural History ........................................................................3

    B. The Board's Claim Construction of "internet protocol" .................3

    C. The Board's Final Written Decision...............................................4

    D. Statement of the Facts...................................................................5

        1. Two Models of Packet-Switched Internetworking – Datagram vs. Virtual Circuit........................................................................5

        2. Weinstein-Forgie: Prior Art Experimental Packet Speech Communication Network Using IP for Control and Virtual Circuit Protocol ST for Speech Transport .............................................8

        3. Integrated Services Digital Network (ISDN) ..........................10

        4. Circuit-Switched Network......................................................11

        5. ATM Network – Virtual Circuit..............................................11

        6. Local Area Network and Ethernet...........................................13

        7. Internet Protocol IP................................................................13

        8. IP vs. ATM ............................................................................15

9.  The Prior-Art Kammerl Reference ............................................................15

10. The Prior-Art Iwami Reference ..............................................................16

11. Comparison of Kammerl, Iwami, and Weinstein-Forgie ...........................18

SUMMARY OF THE ARGUMENT ......................................................................20

    Obviousness ......................................................................................20

ARGUMENT .........................................................................................................23

    A. Standard of Review.......................................................................23

    B. The Board Incorrectly Concluded that the Combination of Kammerl
       and Iwami Teaches the Subject Matter Recited in Claims 1-7 and 15 .........24

       1.  No substantial evidence of an "IP network" as a "transit network
           between two PSTNs" at the time of the invention of the '879
           Patent .........................................................................................27

       2.  No substantial evidence that a PHOSITA could combine the local
           area network (LAN) of Iwami with the broadband ATM virtual
           circuit network of Kammerl such that the combined system would
           result in an "IP network" as a "transit network between two
           PSTNs" ........................................................................................31

       3.  The Board's finding of the combination of Internet Protocol with
           Kammerl's ATM network is excluded by the Board's own claim
           construction of "internet protocol"..............................................34

       4.  The Board's conclusion of combinability of Kammerl and Iwami
           improperly relied on unspecified common knowledge ...........................36

       5.  The Board's erroneous conclusion of obviousness rested on a
           misunderstanding of prevailing network technologies..............................39

       6.  The Board erred by engaging impermissible hindsight
           reconstruction of the claimed subject matter...........................................42

CONCLUSION ...................................................................................................43

CERTIFICATE OF FILING AND SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s):**

## Cases

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
   419 U.S. 281, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974) ........................... 23, 24

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197, 59 S. Ct. 206, 83 L. Ed. 126 (1938) .......................................23

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607, 86 S. Ct. 1018, 16 L. Ed. 2d 131 (1966) ................................23

*Graham v. John Deere Co. of Kan. City*,
   383 U.S. 1, 86 S. Ct. 684, 15 L. Ed. 2d 545 (1966) ......................................23

*In re Applied Materials, Inc.*,
   692 F.3d 1289 (Fed. Cir. 2012) ....................................................................23

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ....................................................................23

*In re Huai-Hung Kao*,
   639 F.3d 1057 (Fed. Cir. 2011) .............................................................. 24, 33

*In re Huston*,
   308 F.3d 1267 (Fed. Cir. 2002) ....................................................................23

*In re Kahn*,
   441 F.3d 977 (Fed. Cir. 2006) ......................................................................42

*In re Lee*,
   277 F.3d 1338 (Fed. Cir. 2002) ....................................................................23

*In re Rouffet*,
   149 F.3d 1350 (Fed. Cir. 1998) ....................................................... 22, 37, 42

*In re Zurko*,
   258 F.3d 1379 (Fed. Cir. 2001) ............................................................. 22, 30

*K/S Himpp v. Hear-Wear Tech., LLC*,
   751 F.3d 1362 (Fed. Cir. 2014) ........................................................... 22, 31

*Kinetics Concept, Inc. v. Smith & Nephew, Inc.,*
   688 F.3d 1342 (Fed. Cir. 2012) ............................................................ 38, 42

*KSR Int'l Co. v. Teleflex Inc.,*
   550 U.S. 398, 127 S. Ct. 1727 (2007) .................................................... 33, 36

*Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.,*
   73 F.3d 1085 (Fed. Cir. 1995) ...................................................................23

*SEC v. Chenery Corp.,*
   332 U.S. 194, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947) ...................................23

*Sec. & Exch. Comm'n v. Chenery Corp.,*
   332 U.S. 194, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947) ...................................23

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ...........................................................................1

35 U.S.C. § 134 ..........................................................................................1

35 U.S.C. § 141 ..........................................................................................1

35 U.S.C. § 142 ..........................................................................................1

35 U.S.C. §§ 311 – 319 ................................................................................3

**Rules and Regulations**

37 C.F.R. § 42.65 ......................................................................................30

37 C.F.R. § 90.2(a) ......................................................................................1

Fed. R. Evid. 705 ......................................................................................30

**Other Authorities:**

MPEP 2144.03 A .......................................................................................39

MPEP 2144.03 E........................................................................................31

Office Patent Trial Practice Guide,
   77 Fed. Reg. 48,756, 48,763 (Section II.A.4) (Aug. 14, 2012).....................30

# GLOSSARY

| GENERAL | | |
|---|---|---|
| A0058 | '879 Patent (Patent-in-suit) | U.S. Patent No. 7,724,879, Entitled "Efficient Communication Through Networks," Filed on August 24, 2007, and Issued on May 25, 2010 |
| | Board | Patent Trial and Appeal Board of the Patent and Trademark Office |
| A0001 | Board Decision | Final Written Decision issued by the Board in the case below *Inter Partes* Review IPR2013-00296 on October 8, 2014 |
| **PRIOR ART** | | |
| A0964 | Kammerl | U.S. Patent No. 5,051,983, Entitled "Method and Circuitry for Transmission of Speech Signals in a Broad-Band Communications Network," Filed on September 5, 1989, and Issued on September 24, 1991 |
| A0821 | Iwami | U.S. Patent No. 5,604,737, Entitled "Voice Communication System and Voice Communication Method," Filed on December 13, 1994, and Issued on February 18, 1997 |
| A0946 | Weinstein-Forgie | Clifford J. Weinstein and James W. Forgie, "Experience with speech communication in packet networks," IEEE Journal on Selected Areas in Communications, Special Issue on Packet Switched Voice and Data Communications, Vol. 1, No. 6, December 1983, pp. 963-980. |
| A0990 | NVP | D. Cohen, RFC 741—Specifications for the Network Voice Protocol (NVP), Nov. 22, 1977, 36 pages |
| A1092 | Internet Protocol | RFC 791, Internet Protocol, Darpa Internet Program, Protocol Specification (Sept. 1981) ("RFC791") |

| TREATISES | | |
|---|---|---|
| A1222 | Perlman | Radia Perlman, Interconnections Bridges and Routers (Addison-Wesley Publishing Company) (1992) ("Perlman") |
| A1539 | Peterson | L. Peterson, B. Davie, Computer Networks: A Systems Approach, pp. 177-180, 276 (1996) |
| A0972 | Ramteke | T. Ramteke, Networks, Prentice-Hall, Inc., 1994, pp. 3, 4, 10, 58-60, 136-138, 245-247, 292-293 and 384 |
| A1253 | Tanenbaum | Computer Networks, Third Edition, Andrew S. Tanenbaum, 1996 Prentice Hall PTR |

## STATEMENT OF RELATED CASES

No appeal in or from this proceeding was previously before this or any other appellate court.

# JURISDICTIONAL STATEMENT

The United States Patent & Trademark Office Patent Trial and Appeal Board ("the Board") had jurisdiction under 35 U.S.C. § 134. The Board mailed its decision on October 8, 2014 (A0001-A0023). Patent Owner AIP Acquisition LLC ("AIP") filed a Notice of Appeal on December 10, 2014 in accordance with 37 C.F.R. § 90.2(a). The appeal was docketed on January 23, 2015. The Notice of Appeal was timely filed pursuant to 35 U.S.C. § 142. This Court has jurisdiction under 35 U.S.C. § 141 and 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

I.      Whether the Board misunderstood the teachings of Kammerl and Iwami;

II.     Whether the Board misunderstood the state of the art at the time of invention of the '879 Patent;

III.    Whether the Board's core factual findings are supported by substantial evidence;

IV.     Whether the Board Decision rested on impermissible hindsight reconstruction.

## STATEMENT OF THE CASE

### A. <u>Procedural History</u>

Level 3 Communications, LLC ("Petitioner") filed a Petition (Paper 6, "Pet.") requesting *inter partes* review of claims 1–15 (all the claims) of U.S. Patent No. 7,724,879 B2 ("the '879 patent") under 35 U.S.C. §§ 311 – 319. On October 31, 2013, the Board instituted an *inter partes* review of claims 1–15 ("the challenged claims") on four asserted grounds of unpatentability ("Decision on Institution"). A0024. Subsequent to institution, AIP Acquisition LLC ("Patent Owner") filed a Patent Owner Response ("PO Resp."). A0318 Petitioner filed a Reply ("Pet. Reply") to the Patent Owner Response. A0404 Oral hearing was held on July 15, 2014. The Board, in its Final Written Decision on October 8, 2014, ordered all of the claims (i.e. claims 1-15) of the '879 Patent unpatentable. A0001.

### B. <u>The Board's Claim Construction of "internet protocol"</u>

The Board construed the term "internet protocol" in its Decision on Institution, "as a set of rules, instructions, or procedures relating to the format and timing of data transmissions between two devices over the Internet, such as TCP/IP. The term "internet protocol," as used in the claims of the '879 Patent, does *not* encompass ATM and frame relay protocols." A0015. In support of its claim construction, the Board acknowledged that the Specification distinguishes the

conversion of telecommunication transmissions of different networks such as the Internet and ATM/Frame Relay networks.  A0013;  A0582.

## C. <u>The Board's Final Written Decision</u>

The Board stated "it would have been obvious to that PHOSITA that combining Kammerl and Iwami would result in an operable system."  A0019.  The Board rejected Appellant's obviousness defense because a person having an ordinary skill in the art ("PHOSITA") "would have at least considered an internet protocol, such as the IP network disclosed in Iwami, as an obvious choice for a protocol to transmit voice data between two PSTNs." A0018.  In support of its finding of obviousness, the Board noted "that, in 1996, it was known that IP 'was ill-suited for real[-]time application like voice' supports a finding that using IP as a transit network, even if less than ideal, would have been obvious." A0019 (footnote 10).

The Board did not cite any evidence to support the finding that the combined system would be operable but rejected the argument that there is not "a single patent or reference that disclosed IP as a bridging network between PSTN-to-PSTN calls."  A0019.

Nonetheless, the Board found that (1) "a PHOSITA would have considered using an IP network as a transit network between two PSTNs in order to provide the benefits of simpler internetworking of diverse networks, even at the expense of

4

potentially slower transit speeds," and (2) "an internet protocol network [was] one of a finite number of identified communications mechanisms that were well-known at the time." A0020.

### D. Statement of the Facts

In order to understand the teachings of the cited Kammerl and Iwami references, it is useful to distinguish the different network technologies known at the time of the invention of the '879 patent.

#### 1. Two Models of Packet-Switched Internetworking – Datagram vs. Virtual Circuit

According to the Perlman treatise, at the time of the invention of the '879 Patent, there were two common models of internetworking.  A1225-A1226.  "Internetworking" is defined as "communication between two networks or two different types of networks or end equipment."  A1069.

##### (a) Datagram Model of Internetworking

One model is "datagram" (or "connectionless") in which the network does its best to deliver the data, but with some probability of the data's getting lost, duplicated, or damaged (the data might become altered).  Each item of data (referred to as "packet") is independently routed, and the network does not guarantee that the packets will be kept in order, meaning that if packet 1 is given to the network, followed by packet 2, packet 2 might be delivered before packet 1. A1225-A1226.

The datagram/connectionless model is similar to the postal system, in which each letter is deposited into the system with a complete address; there is a high probability of the postal service's delivering the letter to the destination, although there is some probability of the letter's being lost or damaged; and a letter posted on Monday might get delivered after a letter posted on Tuesday, even if both were posted from the same location and addressed to the same destination. A1226.  In a datagram communication, such as one using Internet Protocol (IP), each packet may take any path through the network. A1515-A1516, ¶21; A0949, left col., lines 50-51.

### (b) Virtual Circuit Model of Internetworking

According to the Perlman treatise, the other model is known as virtual circuit. In this model, a device (i.e., an endnode) attached to a network first informs the network that it wishes to start a conversation with some other endnode.  The network then notifies the destination that a conversation is requested, and the destination accepts or refuses.  This is similar to using the telephone system.  The caller informs the telephone system of the wish to start a conversation by dialing the telephone number of the destination.  After the destination's telephone number has been dialed, the telephone system establishes a path, reserves whatever resources are necessary, contacts the destination (by ringing its phone), and after the call is accepted, the conversation can take place.  In this example, the term "call" means

the virtual circuit set up by the network and the term "conversation" means the

information flowing on the "call." A1227.

"Often, a virtual circuit has the following characteristics:

i.    The network <u>guarantees</u> that all packets will be delivered in order,
      without loss or duplication.  If anything occurs to prevent the network
      from keeping those guarantees, it disconnects the call.

ii.   A <u>single path</u> is established for the call, and all data follows that path.
      If anything along the path causes the path to cease working, the
      network disconnects the call.

iii.  The network <u>guarantees</u> a certain minimal amount of bandwidth when
      it connects a call, and this bandwidth is reserved for the duration of
      the call.  If the endnodes participating in the call do not utilize those
      resources (they send less data than the bandwidth reserved for them),
      the resources are wasted.

iv.   If a network becomes overly utilized, future call requests are refused
      (like a fast busy signal in the U.S. phone system.)"

A 1227.

As an example, <u>ATM network is a virtual circuit model</u>. A1539.

### 2. Weinstein-Forgie: Prior Art Experimental Packet Speech Communication Network Using IP for Control and Virtual Circuit Protocol ST for Speech Transport

The cited reference: "Experimental Speech Communication in Packet Networks" by Clifford J. Weinstein and James W. Forgie (referred hereafter as "Weinstein-Forgie"), published in 1983, discloses an experimental communication system for transporting speech across ARPANET. Weinstein-Forgie discloses that "[p]acket internetworking techniques can be applied to provide intercommunication among voice users on different types of networks." The experimental Weinstein-Forgie system employs the Network Voice Protocol (NVP). "NVP is designed to pass its packets to a lower level protocol for transport across the network to meet real-time speech requirements." It includes high level functions such as "call setup, packetization, and reconstitution." "The lower level protocol, which has come to be named 'ST,' provides an efficient internet transport mechanism for both point-to-point conversations and conferences." "The name ST is derived from the work 'stream' which refers to the type of traffic load that voice customers offer to a packet network. ST operates at the same level in the protocol hierarchy as IP, the DoD standard internet protocol for datagram traffic." "NVP may call on Internet Protocol (IP) for delivery of control packets, and on ST for delivery of voice packets." Importantly, "ST differs from IP in being a virtual circuit rather than a datagram protocol. Transmission of ST packets must be

8

preceded by a connection setup process arranged by an exchange of control messages.  During the connection setup, an internet route is established, and gateways along the path build tables pertaining to the connection." (emphasis added.)  A0949.

"IP is used primarily in call setup situations, and ST is used for speech transport."  A0949.

The below figure illustrates the protocol hierarchy of NVP, ST and IP protocols.



Fig. 3.  Protocol hierarchy for internet packet voice and data communication.

A0949.

Weinstein-Forgie lists the following requirements for packet speech transmission.

TABLE III
THE ST PROTOCOL FOR PACKET SPEECH

| Packet Speech Requirements | | ST Approach | |
|---|---|---|---|
| 1) | Guaranteed data rate. | 1) | Know requirements in advance. Request reserved network resources when available (e.g., PODA streams). Assign loads to links statistically in routing virtual circuits. |
| 2) | Controlled delay (predictable dispersion). | 2) | Prevent congestion by controlling access on a call basis. |
| 3) | Small quantity of speech per packet. | 3) | Set up virtual circuit routes so that abbreviated headers can be used. Aggregate small packets for efficiency. |
| 4) | Efficiency equal to or better than circuit switching without TASI. | 4) | Abbreviated headers for packet efficiency. Goal of high link utilization with effective traffic control. |
| 5) | Efficient use of broadcast media. | 5) | Control multiaddress setup for conferencing and replicate packets only when necessary. |

Thus, the experimental Weinstein-Forgie system "provided a practical demonstration of the feasibility of packet speech in a large variety of packet network and internetwork environments. " A0961.

### 3. Integrated Services Digital Network (ISDN)

Integrated Services Digital Network (ISDN) evolved from the Public Switched Telephone Network (PSTN) and was designed to carry voice and data using the same wiring. A0987-A0988.

### 4. Circuit-Switched Network

The telephone network infrastructure commonly known as the Public Switched Telephone Network (PSTN) was originally designed to provide ubiquitous worldwide two-way voice communication. A0985.  In circuit-switched networks, a circuit is dedicated between end users and no other communication can be carried on the same circuit.  A0986; A0601, ¶ 21.

### 5. ATM Network – Virtual Circuit

Asynchronous transfer mode (ATM) is a high speed switching technology that "has been embraced by the telephone industry."  "ATM is a connection-oriented, packet-switched network, which is to say, it uses virtual circuits ….  In ATM terminology, the connection setup phase is called signaling."  "The thing that makes ATM really unusual is that the packets that are switched in an ATM network are of fixed length.  To distinguish these fixed-length packets from the more common variable-length packets normally used in computer networks, they are given a special name:  cells."  A1539.

"Fixed-length packets turn out to be a very helpful thing if you want to build fast, highly scalable switches.  There are two reasons for this:  (1) It is easier to build hardware to do simple jobs, and the job of processing packets is simpler when you already know how long each one will be.  (2) If all packets are the same

length, then you can have lots of switching elements all doing much the same thing in parallel, each of them taking the same time to do its job." A1540.

"Having decided to use small, fixed-length packets, the next question is, What is the right length to fix them at? If you make them too short, then the amount of header information that needs to be carried around relative to the amount of data that fits in one cell gets larger, so the percentage of link bandwidth is actually used to carry data goes down …. On the other hand, if you make the cells too big, then there is a problem of wasted bandwidth caused by the need to pad transmitted data to fill a complete cell. If the cell payload size is 48 bytes and you want to send 1 byte, you'll need to send 47 bytes of padding. If this happens a lot, then the utilization of the link will be very low." A1541-1542.

"An ATM net is composed of two different devices, the "switch" and the "endpoints." A1548. "An ATM network consists of a set of ATM switches interconnected by point to point ATM interfaces. ATM switches support two primary types of interfaces:

- UNI (User-to-Network Interface): it connects ATM end systems (such as hosts and routers) to an ATM switch.

- The NNI (Network-to-Network Interface): it connects two ATM switches."

A1548.

### 6. Local Area Network and Ethernet

According to the Peterson reference, Ethernet makes use of shared media. A1539, line 9. Fig. 5-44 of the Tanenbaum treatise shows different configurations of an LAN. A1256; see also A1249, Fig. 4. According to the Ramteke reference, "With Ethernet, the range of a [local area network] LAN can be extended from 500 meters to 2500 meters by placing up to four repeaters." A0989. "Repeaters, however, only repeat the signals and if we keep adding more stations to the LAN, and add more traffic to it by using it more than before, then eventually our throughput will degrade. This is because the number of collisions will increase." A0989.

### 7. Internet Protocol IP

"The internet protocol provides for transmitting blocks of data called datagrams from sources to destinations, where sources and destinations are hosts identified by fixed length addresses." A1096. "The internet protocol is specifically limited in scope to provide the functions necessary to deliver a package of bits (an internet datagram) from a source to a destination over an interconnected system of networks. There are no mechanisms to augment end-to-end data reliability, flow control, sequencing, or other services commonly found in host-to-host protocols." A1096. "The internet protocol implements two basic functions: addressing and fragmentation. The internet modules use the addresses

13

carried in the internet header to transmit internet datagrams toward their destinations. The selection of a path for transmission is called routing." A1097. "The internet protocol treats each internet datagram as an independent entity unrelated to any other internet datagram. <u>There are no connections or logical circuits (virtual or otherwise)</u>." (emphasis added.) A1097.

As shown in the figure below, the internet protocol IP interfaces on one side to the higher level host-to-host protocols (e.g., TCP and UDP) and on the other side to the local network protocol.



A1100.

### 8. IP vs. ATM

"While we have presented IP as the only protocol for global internetworking, there are other contenders, most notably ATM." "For IP, one of the biggest challenges will be to provide quality of service guarantees that are suitable for high-quality voice and video, something that is likely to be available in ATM networks from the outset. In a sense, ATM does not deal well with heterogeneous technologies: it works best when everyone uses ATM. IP, at present, does not deal well with a wide range of applications: it is best suited to those without real-time constraints." "A likely challenge for the future integration of ATM and IP is the provision of end-to-end quality of service guarantees in an internetwork that includes both ATM and non-ATM-technologies." A1543.

### 9. The Prior-Art Kammerl Reference

Kammerl discloses a broadband communication network for bridging voice packets between PSTNs by means of Interworking Units (NUE) connected between the telephone networks and the broadband packet network. A0964. The broadband communication network, which employs "asynchronous time division" and transmits packets of fixed length or "cells", is an ATM network. A0968, 1:18-28; A0969, 3:35-38; A1539; A1519, ¶33. The ATM network is a connection-oriented network which uses virtual circuits. A1539, lines 11-12; A1519, ¶33.

The Interworking Unit (NUE) "performs all the signals and procedure conversions needed for network transfer" between the ATM and the telephone networks. A0969, 4:1-2. A packing/depacking unit fills the speech signal packets according to a control signal from the Interworking Unit (NUE). The packets are filled "only up to a reduced degree of packet filling or to break up the signal packets to be transmitted in accordance with the reduced degree of packet filling." A0969 3:61 – 4:4; and 4:49 – 32–61.

Kammerl's invention was motivated by the concern that any payload size chosen for ATM would not eliminate the need to purchase expensive echo cancellation equipment. A1522, ¶43. Kammerl's invention is to reduce the packetization delay for telephone connections that cross both a fixed length packet switching network (PN) and a telephone switching network (AN) by reducing "the degree of packet filling" of the speech packets communicated over these connections. A0968, 2:2-4; A1522, ¶43.

**10.The Prior-Art Iwami Reference**

Iwami discloses a system for originating a phone call from a communication terminal in a packet-switched Local Area Network ("LAN") to and for terminating a phone call from a telephone connected to public telephone network. A0822, Fig. 1. The communication control performed between communication terminals for transmitting and receiving packets in the Local Area Network is exemplified by

"Etherphones using Ethernet."  A0842, 1:24-28. In operation, a Communication Server, upon acceptance of a voice communication request from the telephone to a communication terminal, "edits the voice information into packets, and transmits the packets to the communication terminal." A0842-A0843, 2:52 – 3:10.  Both the Communication Server and communication terminals are connected to each other via the LAN through their respective LAN Communication Controller 14.  A0823, A0827, Figs. 2 and 6.  The Communication Server communicates directly with the communication terminals in the LAN as shown by the "sequence diagrams" in Figs. 11 and 12.  A0832-A0833.  Iwami contemplates, "as a modified example of the present invention, the LAN communication controller 14 shown in Fig. 2 may be adapted to simultaneously support a plurality of communication protocols, for example, TCP/IP protocol and UDP/IP protocol , such that the voice communication packet is transmitted utilizing the UDP/IP protocol in the processing flows shown in FIGS. 4 and 10, and control information such as the voice communication request command and voice communication end notice command shown in FIG. 5 and the connected terminal determination result notice command shown in FIG. 19 are transmitted utilizing the TCP/IP protocol."  A0850, lines 44-58.  In other words, the voice packets transmitted between the Communication Server and the communication terminal in the LAN may be transmitted using UDP/IP while the control information is transmitted using TCP/IP.

17

However, Iwami does not disclose or suggest how its LAN using UDP/IP and TCP/IP as described above may be configured as a broadband transit network for bridging or transmitting voice packets between PSTNs (i.e. circuit-switched networks). Nor does Iwami suggest how its LAN using UDP/IP for voice packets and TCP/IP control information may be adapted for use in a virtual circuit ATM network.

## 11. Comparison of Kammerl, Iwami, and Weinstein-Forgie

Below is a comparison table showing the differences among the prior art speech communication packet switched networks: Kammerl, Iwami, and Weinstein-Forgie.

| Features | Kammerl | Iwami | Weinstein-Forgie |
|---|---|---|---|
| Network Type | Broadband Network (ATM); A0964 | Local Area Network (LAN); A0821 | Broadband Network (ARPANET – predecessor to the Internet); A0602-A0603, ¶23-26 |
| Range limitation | None disclosed | 500 meters; may be extended up to 2500 meters with repeaters. A0989 | None disclosed |
| Voice Transmission Methodology | Virtual circuit ATM network using fixed length packets, i.e. cells; A0964; A1539, line 9; A1519, ¶33. | Ethernet and Shared media; A0989, A1539, line 9; contemplates using TCP/IP for initiating and terminating a voice call, and UDP/IP for voice transmission. A0850, 17: 44-58. | Virtual circuit using experimental ST protocol for voice transmission and IP for call setup. A0949 |

| Internetworking | Interworking Units to interconnect telephone exchanges with one or more ATM networks; not suitable for heterogeneous networks; A0966, Fig. 2; A1543 | | Gateways to interconnect different networks (e.g., PRNET, LEXNET) through ARPANET. A0960 |
| --- | --- | --- | --- |
| Problem(s) solved | Improve quality of voice transmission in an ATM network.  A0968; A1522, ¶43. | Receiving and making telephone calls from a communication terminal in a Local Area Network. A0822 and A0832, Figs. 1 and 11. | Feasibility of packet speech in a large variety of packet network and internetwork environments. A0961, left col., lines 41-43. |

## SUMMARY OF THE ARGUMENT

### Obviousness

The Board's obviousness determination is not supported by substantial evidence because it improperly relied on Appellee's expert's conclusory assertion that "an internet protocol network [was] one of a finite number of identified communications mechanism that were well-known at the time" without supporting documentary evidence.  The Board's unquestioned acceptance of the Appellee's expert's conclusory assertion is a core factual finding in the Board's patentability determination.

The Board wrongly concluded, without explanation of sound technical reasoning, that a PHOSITA could combine the local area network (LAN) of Iwami with the broadband ATM virtual circuit network of Kammerl to result in an "IP network" as a "transit network between two PSTNs."

The Board did not cite any evidence as to the description or characteristics of such "IP network" as understood by a PHOSITA at the time of invention of the '879 Patent.

The Board also did not cite any evidence in support of its finding that Iwami's LAN may be modified so as to result in a broadband IP transit network or that it is an obvious substitute for Kammerl's broadband ATM network for the purpose of internetworking public telephone networks.  In fact, Iwami and the

prior art of record teach that (1) Iwami's LAN, which may employ Ethernet and shared media, is limited to a range of 2500 meters (A0842, 1:24–28; A1539, line 9; A0989), and (2) Iwami's LAN is specifically configured for receiving and making phone calls from communication terminals in the LAN, and not for <u>bridging traffic between</u> public telephone networks.

By finding that Kammerl teaches a "generic broadband network," the Board wrongly concluded by: (1) substituting the broadband virtual circuit network of Kammerl with a broadband connectionless IP transit network that is neither taught nor disclosed by Iwami or the prior art of record, (2) assuming that a PHOSITA can readily modify Iwami's LAN into a broadband "IP network" for voice packet transmission <u>between</u> public telephone networks, (3) ignoring the fundamental differences between a virtual circuit network and a datagram network, and (4) ignoring the network topology, characteristics and limitations of Iwami's LAN.

By finding that Kammerl does not teach away from the use of an internet protocol in an ATM network, the Board wrongly concluded that it would be obvious for a PHOSITA to combine the "IP network disclosed in Iwami" with Kammerl's ATM network and such combination would result in an operable system. The lack of teaching away by a reference does not equate to a finding of a teaching that an IP transit network is an obvious substitute for a virtual circuit network absent supporting documentary evidence or sound technical and scientific

reasoning.  Unsupported opinion by Appellee's expert does not constitute

sufficient evidence.  Both MPEP 2144.03 and the Federal Circuit in *K/S Himpp v.*

*Hear-Wear Tech., LLC,* 751 F.3d 1362 (Fed. Cir. 2014), and in *In re Zurko*, 258

F.3d 1379 (Fed. Cir. 2001),  admonished the use of unsupported opinions or

conclusory assertions of facts.

The Board also erred by engaging impermissible hindsight reconstruction of

the claimed subject matter by selectively combining features of the cited references

Kammerl and Iwami without sound technical and scientific reasoning leading to

such combination.  "Hindsight" is inferred when the specific understanding or

principle within the knowledge of one of ordinary skill in the art leading to the

modification of the prior art in order to arrive at Appellant's claimed invention has

not been explained.  *In re Rouffet*, 149 F.3d 1350, 1358 (Fed. Cir. 1998).

# ARGUMENT

## A. <u>Standard of Review</u>

The Federal Circuit in *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed.

Cir. 2012) has stated:

> Obviousness is a question of law with several underlying
> factual inquiries, including what a reference teaches, whether a
> reference teaches away, and whether there is commercial success.
> *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17-18, 86 S. Ct.
> 684, 15 L. Ed. 2d 545 (1966); *Para-Ordnance Mfg., Inc. v. SGS Imps.
> Int'l, Inc.*, 73 F.3d 1085, 1088 (Fed. Cir. 1995). This court reviews
> the Board's determination of obviousness de novo and the Board's
> factual findings for substantial evidence. *In re Gartside*, 203 F.3d
> 1305, 1316 (Fed. Cir. 2000). Substantial evidence is "such relevant
> evidence as a reasonable mind might accept as adequate to support a
> conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.
> Ct. 206, 83 L. Ed. 126 (1938). "[T]he possibility of drawing two
> inconsistent conclusions from the evidence does not prevent an
> administrative agency's finding from being supported by substantial
> evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620, 86 S.
> Ct. 1018, 16 L. Ed. 2d 131 (1966).
>
> The Board's judgment must be reviewed on the grounds upon
> which the Board actually relied. See *Sec. & Exch. Comm'n v. Chenery
> Corp.*, 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947); *In re
> Lee*, 277 F.3d 1338, 1345-46 (Fed. Cir. 2002). Alternative grounds
> supporting the Board's decision generally are not considered. See *Lee*,
> 277 F.3d at 1346. "The [Board] must set forth its findings and the
> grounds thereof, as supported by the agency record, and explain its
> application of the law to the found facts." *Id.* at 1342.
>
> However, "[w]hile we may not supply a reasoned basis for the
> agency's action that the agency itself has not given, *SEC v. Chenery
> Corp.*, 332 U.S. 194, 196, 67 S. Ct. 1575, 91 L. Ed. 1995 (1947), we
> will uphold a decision of less than ideal clarity if the agency's path
> may reasonably be discerned." *Bowman Transp., Inc. v.
> Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86, 95 S. Ct. 438,
> 42 L. Ed. 2d 447 (1974); see also *In re Huston*, 308 F.3d 1267,
> 1280-81 (Fed. Cir. 2002) (affirming the Board's "cryptic" conclusions

because the Board's path could be discerned and the Board's decision was supported by substantial evidence (quoting *Bowman*, 419 U.S. at 285-86, 95 S. Ct. 438)).

### B. <u>The Board Incorrectly Concluded that the Combination of Kammerl and Iwami Teaches the Subject Matter Recited in Claims 1-7 and 15</u>

Without supporting documentary evidence or explanation of technical principles, the Board wrongly concluded that "modifying Kammerl to use an internet protocol as taught by Iwami would have been obvious to that PHOSITA" and that "the combination of Kammerl and Iwami teaches the subject matter recited in claims 1-7 and 15." A0020.  The Board's conclusion was not supported by substantial evidence because its core factual findings were based on an unsupported opinion of Appellee's expert, unspecified common knowledge or conjecture. *In re Huai-Hung Kao*, 639 F.3d 1057, 1067 (Fed. Cir. 2011) ("For these reasons, the Board's reliance on its own conjecture regarding whether a direct substitution of oxymorphone in Formula 6 would satisfy the claimed range of dissolution rates is improper.").  The Board also erred in its conclusion because its obviousness determination rested on (1) a misreading of Kammerl and Iwami, (2) a misunderstanding of the different network technologies at the time of the invention, and (3) impermissible hindsight reconstruction.

The Board determined that Kammerl teaches a generic broadband packet switched network such that the different network technologies –virtual circuit ATM network, connectionless datagram "IP network," and local area network

(LAN) – can be simply substituted by a PHOSITA.  Alternatively, according to the Board, Kammerl's ATM network can be converted into an IP network by simply using Internet Protocol (IP).  This determination is not supported by any technical principles or prior art in the evidentiary record.

By concluding that Kammerl teaches a generic broadband network that can be turned into "an IP network" by the use of internet protocol, the Board demonstrates a lack of understanding of the fundamental principles of the different models of internetworking as taught by the prior art of record: virtual circuit model or connectionless datagram model.  Indeed, none of the prior art of record, including Kammerl and Iwami, supports a finding of the existence of such a generic broadband network and which can be modified to replace a virtual circuit network disclosed by Kammerl with an LAN disclosed by Iwami, or that a virtual circuit ATM network can be changed into a connectionless datagram IP network by simply substituting the ATM protocol with an internet protocol.

The only other broadband packet switched network in the evidentiary record is the experimental Weinstein-Forgie system that requires experimental software (e.g., ST virtual circuit protocol) and experimental hardware (e.g. internet gateways supporting both ST and IP and specialized ST-based voice terminals) to transmit voice packets. The experimental Weinstein-Forgie system teaches the use of NVP for host-to-host control, IP for call setup and ST (an experimental virtual

circuit protocol) for voice packet transmission.  It is unclear whether the Weinstein-Forgie system is "an internet protocol network" within the meaning of the Board's usage of such term or a basis of the Appellee's expert's opinion of a well known IP network because of this mixed usage of NVP, IP and ST in the system.  In contrast, in a multi-network environment, TCP is used as a host-to-host protocol.  A1420.

As described above, Iwami teaches a communication system that routes phone calls into and out of the LAN (see A0822), but which does not serve as a transit network between two PSTNs.  See A1256, Fig. 5-44, for examples of LANs. The Board did not cite any documentary evidence that Iwami's local area network can be modified in combination with a broadband virtual circuit network into a broadband IP transit network between two PSTNs.  The Board did not cite any documentary evidence or take Official Notice that the knowledge for a PHOSITA to convert Iwami's LAN into a broadband IP transit network is common knowledge.  Rather, the Board relied on the conclusory opinion of Appellee's expert for its core factual findings.

Furthermore, the prior art of record teaches that the LAN (which may be analogized as a cul-de-sac) uses shared media and has a maximum range of 2500 meters.  A1539, line 9;  A0989; A1256 (Fig. 5-44).  The Board did not cite any documentary evidence in support of its conclusion that a PHOSITA can modify

Iwami's LAN into a broadband IP network for internetworking with or transmitting phone calls between two PSTNs, while overcoming this 2500 meter range limitation in the process.

Therefore, the Board's finding of combinability of Kammerl and Iwami is not supported by substantial evidence.

### 1. No substantial evidence of an "IP network" as a "transit network between two PSTNs" at the time of the invention of the '879 Patent

The Board found persuasive Appellee's expert's conclusory opinion that "an internet protocol network [was] one of a finite number of identified communications mechanisms that were well-known at the time" of the invention. A0020; A0700-A0701, ¶227 and 229. The Appellee's expert did not explain or describe what constitutes such "an internet protocol network" or identify what were the well-known and finite number of "identified communications mechanisms" at the time of the invention of the '879 Patent. A0701, ¶229. Appellee's expert's conclusory opinion also did not cite any prior art reference where such "IP network" is identified as well-known or common knowledge.

In his Declaration, Appellee's expert described the "voice communications systems of ISI and ATI" as allegedly IP based prior art systems. A0607, ¶32.

The ISI system includes a packet satellite network, a packet voice terminal, and "a switched telephone network interface (STNI) which allows connection from individual telephone lines to the wide-band packet system." A0960, left col., 2nd

27

paragraph.  The ISI voice communication system described by Appellee's expert is the experimental Weinstein-Forgie system.  A0603, ¶26 (citing the Abstract of Weinstein-Forgie reference).  The Weinstein-Forgie system employs NVP for host-to-host control, IP for control messages, and ST virtual circuit protocol for voice transmission.  A0603, ¶25; A0949, Fig. 3; A0958, Fig. 10; A0959, Fig. 11. Appellee's expert implied that the "packet satellite network" and the "packet voice terminals" are examples of a natural progression of "packet voice telephone services" but failed to acknowledge that the ISI voice communication system (i.e. the experimental Weinstein-Forgie system) is an experimental virtual circuit network using experimental ST protocol for voice packet transmission.  A0603-A0604, ¶26.  Indeed, Weinstein-Forgie expressly discloses that "ST differs from IP in being a virtual circuit rather than a datagram protocol." A0949, lines 50-51.

Thus, as a threshold matter, the Board should decide (1) whether an experimental ST voice transmission mechanism, possibly known only to the research community, constitutes a communications mechanism that is well-known or common knowledge to the general design community, and (2) whether the Weinstein-Forgie system which uses IP for control and ST for voice transport constitutes "an IP network".  The Board did not make such findings.

The so-called "voice communication system" of ATI disclosed by Appellee's expert in his Declaration, ¶ 31 and 32 (A0606-A0607), is US Patent

No. 5,608,786 to Gordon entitled "Unified Messaging System and Method" issued on March 4, 1997 ("Gordon").  A0808.  Gordon discloses that "Voice mail, E-mail, facsimiles, and other message types can be received by the system for retrieval by the subscriber.  Communications may be centralized and retrieval of messages can be accomplished using one of a number of separate and distinct approaches.  Thus, data communication networks such as the Internet can become global voice mail and facsimile mail systems."  A0808, Abstract.  According to the Appellee's expert, Gordon teaches a node that "receives a telephone formatted voice transmission from the first telephone set and converts the voice transmission into Internet-formatted data."  A0606-A0607, ¶31.  However, a closer reading of the passage cited by the Appellee's expert reveals that Gordon contemplates that the node can "provide conversion of facsimile transmissions to E-mail, or E-mail to speech." A0815-A0816, 4:58 – 5:11.

The Appellee's expert seemingly believes a voice mail and facsimile mail retrieval system is a "voice communication system" similar to the real time speech communication network of Weinstein-Forgie (or ISI) or Kammerl's ATM network.  But the Appellee's expert did not state whether Gordon's voice/facsimile mail retrieval system constitutes "one of a finite number of identified communications mechanisms that were well-known at the time" of the invention of the '879 Patent.  Neither did the Board.

Nonetheless, based on the Appellee's expert's conclusory opinion, a core factual finding, the Board determined that "the Petition establishes that modifying Kammerl to use an internet protocol as taught by Iwami would have been obvious to that PHOSITA." A0020.

This Court has stated: "With respect to core factual findings in a determination of patentability, however, the Board cannot simply reach conclusions based on its own understanding or experience — or on its assessment of what would be basic knowledge or common sense. Rather, the Board must point to some concrete evidence in the record in support of these findings." *In re Zurko*, 258 F.3d 1379, 1386 (Fed. Cir. 2001). Here, the Board's obviousness determination rested on the Appellee's expert's conclusory assertion of basic or common knowledge of a well-known IP protocol network without citation to any specific prior art IP network. According to the Court in *Zurko*, this is the type of core factual finding that requires the Board to point to some concrete evidence in the record to support its finding. Also, under the Office Patent Trial Practice Guide, "Affidavits expressing an opinion of an expert *must* disclose the underlying facts or data upon which the opinion is based. *See* Fed. R. Evid. 705; and 37 C.F.R. § 42.65. Opinions expressed without disclosing the underlying facts or data may be given little or no weight." (emphasis added.) Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,763 (Aug. 14, 2012) (Section II.A.4). Thus, an

expert's conclusory opinion is not sufficient evidence as a core factual finding for

obviousness determination. *See also*, MPEP 2144.03 E ("It is never appropriate to

rely sole on common knowledge in the art without evidentiary support in the

record as the principal evidence upon which a rejection was based."); *cf. K/S*

*Himpp*, 751. F.3d at 1366 ("The Board's decision was correct because an

assessment of basic knowledge and common sense as a replacement for

documentary evidence for core factual findings lacks substantial evidence

support.").

Patent Owner respectfully submits that the Board's core factual finding was

not supported by substantial evidence.  Therefore, the Board's obviousness

determination is erroneous.

### 2. No substantial evidence that a PHOSITA could combine the local area network (LAN) of Iwami with the broadband ATM virtual circuit network of Kammerl such that the combined system would result in an "IP network" as a "transit network between two PSTNs"

Appellee argued Kammerl teaches "the general concept of using a data

network as a transit network between two PSTNs (Pet. Reply 3—6), including

sending, receiving, and converting transmission in such a hybrid network." A0014.

The Board found that "claim 1 of the '879 patent differs from Kammerl only in

that the data network disclosed by Kammerl does not use an internet protocol," and

that "Iwami only discloses a single conversion from a telecommunication protocol

to an internet protocol."  A0017.  The Board concluded that "it would have been an

31

[sic] obvious to that PHOSITA that combining Kammerl and Iwami would result in an operable system."  A0019.

The Board did not describe how such PHOSITA would combine the teachings of Kammerl and Iwami to create such operable system.  Nor did the Board cite any documentary evidence, known methods, or technical principles that Kammerl's broadband ATM virtual circuit network could be replaced with Iwami's LAN or that somehow "the general concept of using a data network as a transit network between two PSTNs" taught by Kammerl can be replaced with Iwami's LAN.  Iwami's LAN, like other LANs (which may be analogized as cul-de-sacs), uses shared media, has a maximum range of 2500 meters, and is not configured as a transit network between two PSTNs or different networks.  A1539, line 9; A0989; A1256, Fig. 5-44.

To the extent the Board concluded that Kammerl teaches the general concept of using a data network as a transit network between two PSTNs and that Iwami teaches Internet Protocol for voice communication, a PHOSITA does not have sufficient enabling teachings from these references to create an operable system.  For example, a PHOSITA could not use Iwami's LAN system architecture as a transit network because it is configured to only receive and transmit calls to a PSTN telephone, not between two PSTN telephones.  A0822, Fig. 1.  This distinction matters.  Thus, using Iwami's LAN without modification for the

purpose of a transit network between two PSTNs would not result in an operable system. The Board made no findings as to what such modification, if any, is required. Such findings are necessary to demonstrate that it is indeed obvious for the PHOSITA or within the grasp of the PHOSITA to combine Kammerl and Iwami to produce an operable system, in light of the vastly different networking technologies disclosed by Kammerl and Iwami. The Board cannot ignore the fact that by finding broader teachings of these references the PHOSITA still requires guidance to combine these broader teachings to create an operable system. There is no such evidence in the evidentiary record. *See*, *e.g.*, *In re Huai-Hung Kao*, 639 F.3d at 1067 ("The Board's own conjecture does not supply the requisite substantial *evidence* to support the rejections, i.e., "such evidence as a reasonable mind might accept as adequate to support a conclusion.""); *cf. KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427, 127 S. Ct. 1727, 1746 (2007) ("KSR provided <u>convincing evidence</u> that mounting a modular sensor on a fixed pivot point of the Asano pedal was a design step well within the grasp of a person of ordinary skill in the relevant art" (emphasis added)). Or that the evidence is less than convincing.

The Board seemingly concluded that a PHOSITA could combine the two different types of networks (*i.e.*, Iwami's LAN with its 2500 meter limitation and shared media environment and Kammerl's broadband virtual circuit ATM network) and somehow produce a third type of network, namely, a broadband

33

connectionless IP transit network for transporting voice traffic between two PSTNs – without further teachings or known technical principles. A0020. Under this scenario, the PHOSITA would be left with numerous unanswered questions including the consequences of using a virtual circuit model or connectionless datagram model for the IP transit network. The Perlman treatise discussed the strengths and weaknesses of the virtual circuit model and the connectionless model the PHOSITA may consider. A1228—A1230.

Accordingly, without evidence of such further teachings, Patent Owner respectfully submits that the Board's conclusion of obviousness is erroneous and not supported by substantial evidence.

### 3. The Board's finding of the combination of Internet Protocol with Kammerl's ATM network is excluded by the Board's own claim construction of "internet protocol"

The Board relied on the opinion of the Appellee's expert that "[t]he Internet Protocol as taught by Iwami could be used over the ATM network taught by Kammerl. Doing so would have allowed Kammerl's voice communications to be transmitted on networks other than ATM networks." A0700, ¶ 227. That opinion, however, is without any support. Appellee's expert did not describe or explain how a PHOSITA could implement the Internet Protocol over Kammerl's ATM network. In fact, the Appellee's expert's assertion of using Internet Protocol to transmit voice communications on networks other than ATM networks is

contradicted by the Peterson reference which states that "ATM does not deal well with heterogeneous technologies:  it works best when everyone uses ATM." A1543.

In any event, assuming *arguendo* that Kammerl and Iwami are combinable, Patent Owner AIP cited ATM Adaptation Layer 5 (AAL5) protocol as a prior art technology that could implement such a combination, *i.e.*, integrating IP over Kammerl's ATM network.  A1534, ¶78; A1782. Inexplicably, the Board did not acknowledge this combination using AAL5 protocol, which was known to a PHOSITA at the time of the invention.   Apparently, ATM Adaptation Layer 5 protocol is an ATM protocol, and thus, is not an "internet protocol" under the Board's claim construction because the term "internet protocol" excludes ATM and Frame Relay protocols.  The Board's claim construction of "internet protocol" (excluding ATM/Frame Relay protocols) is consistent with the two common models of internetworking – virtual circuit and connectionless datagram – known at the time of the invention.  A1515-A1516, ¶21; A0949, left col., lines 50-51.

Rather than explaining what other ways Kammerl and Iwami can be combined, the Board simply asserted that it was obvious to combine Kammerl and Iwami because "it would have been an [sic] obvious to that PHOSITA that combining Kammerl and Iwami would result in an operable system."  A0019.

Accordingly, Patent Owner respectfully submits that the Board's conclusion on the combinability of Kammerl and Iwami is erroneous and not supported by substantial evidence.

### 4. The Board's conclusion of combinability of Kammerl and Iwami improperly relied on unspecified common knowledge

To the extent that the Board failed to cite the requisite technical principles that a PHOSITA may use to combine Kammerl and Iwami, the Board's findings and obviousness determination rested on unspecified common knowledge. Moreover, the prior art of record clearly demonstrates that LAN (with its 2500 meter limitation and shared media environment) and virtual circuit ATM network employ vastly different network technologies. Neither Kammerl nor Iwami expressly teaches a PHOSITA the requisite technical principles to combine the LAN of Iwami with the virtual circuit ATM network of Kammerl. The Board did not make any such findings.

Although a reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it describes and attempts to protect, the Board cannot infer "teachings" from Kammerl without explaining the specific technological principles that a PHOSITA could use to apply such "teachings" to modify Kammerl and/or Iwami in a manner that would result in the claimed invention. *See KSR*, 127 S. Ct. at 1740-1741 ("Often, it will be necessary for a court to look to interrelated teachings of multiple patents; the effects of

36

demands known to the design community or present in the marketplace; and the

background knowledge possessed by a person having ordinary skill in the art, all in

order to determine whether there was an apparent reason to combine the known

elements in the fashion claimed by the patent at issue. To facilitate review, this

analysis should be made explicit.").  Without such explanation, the Board

improperly inferred that the PHOSITA has unspecified common knowledge to

modify vastly different network technologies (*i.e.*, virtual circuit ATM network

and LAN) to arrive at the claimed invention. *See*, *e.g.*, *Rouffet*, 149 F.3d at 1358.

With respect to Iwami, the Board found that "Iwami only discloses a single

conversion from a telecommunication protocol to an internet protocol.  Iwami does

not disclose performing the recited second conversion."  A0017.  This conclusion

reflects the fact that Iwami teaches an LAN, not a transit network between

different networks.  A fair reading of Iwami indicates that its communication

system is configured to route traffic into and out of a LAN (which may be

analogized as a cul-de-sac).  A0822; A1256 (Fig. 5-44).  Importantly, Iwami does

not teach that its LAN may be configured to serve as a transit network between

different networks including telephone networks.  Iwami contemplates the use of

TCP/IP and UDP/IP in its LAN but its use of TCP/IP and UDP/IP is for

implementation in its LAN environment (which is exemplified by the use of shared

media and a maximum range of 2500 meters).  A1539, line 9; A0989.  Iwami does

not teach that its voice transmission methodology in a LAN environment may be employed in a broadband transit network such as Kammerl's virtual circuit ATM network. The Board did not make any findings or cite common knowledge as to how Iwami's TCP/IP and UDP/IP may be employed in a network environment other than that is taught by Iwami's LAN.

As for Kammerl, the Board found that "there is nothing in Kammerl stating that a network using an internet protocol would not function as a transit network between two PSTNs." A0017-A0018. But a negative finding of teaching-away in Kammerl cannot be a basis for the conclusion that Kammerl affirmatively "teaches," without additional documentary evidence or explanation of technical principles, how a PHOSITA could modify Kammerl's ATM network to use "an internet protocol as taught by Iwami." Thus, the Board should make explicit findings as to how the references would be combined to produce the claimed invention. See *Kinetics Concept, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1368 (Fed. Cir. 2012) ("While the Supreme Court made clear that a mechanical application of the teaching-suggestion-motivation test, requiring an explicit teaching in the prior art, is inappropriate, '[w]e must still be careful not to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention.'"). Implicitly, the Board concluded that there is common

knowledge in the art to convert a virtual circuit ATM network into a different internetworking mode such as connectionless datagram internetworking. The Board did not take Official Notice of such common knowledge. Patent Owner is not aware of any prior art in the evidentiary record that indicates such knowledge is "capable of instant and unquestionable demonstration as being well-known." *See* MPEP 2144.03 A.

Therefore, there is no substantial evidence to support the Board's conclusion that the combination of Kammerl and Iwami would result in an operable "IP network as a transit network between two PSTNs."

### 5. The Board's erroneous conclusion of obviousness rested on a misunderstanding of prevailing network technologies

Although Patent Owner acknowledges that one teaching of Kammerl is a "generic network topo[logo] that shows a packet switched network … serving as a bridging network between PSTN to PSTN," it does not follow that Kammerl teaches other internetworking technologies beyond ATM network technology. A0015.

The Board noted that "Kammerl never mentions, and thus, never criticizes, discredits, or otherwise discourages, using a network with message formatted in an internet protocol as a transit network between two PSTNs." A0018 Thus, according to the Board, "a PHOSITA would have at least considered an internet

protocol, such as the IP network disclosed in Iwami, as an obvious choice for a protocol to transmit voice data between two PSTNs." A0018.

In view of the two contrasting modes of internetworking: virtual circuit and connectionless datagram, an IP network would be an obvious choice only if a PHOSITA has sufficient teachings that a simple substitution of one for the other would yield predictable results, i.e. replacing Kammerl's virtual circuit ATM network with Iwami's IP based LAN network (which may be analogized as a cul-de-sac), would result in a third type of network, *i.e.*, a connectionless datagram IP transit network. But the Board did not acknowledge these vastly different internetworking technologies or cite any teachings from the evidentiary record that a PHOSITA could substitute Kammerl's broadband ATM network with Iwami's LAN so as to provide a network different from Kammerl and Iwami – an operable connectionless datagram IP transit network for transmitting voice packets between two PSTNs.

Moreover, the Board did not acknowledge the fundamental differences between the two models of internetworking at the time of the invention: a virtual circuit model such as ATM and a connectionless datagram model. These two models of internetworking facilitate data communication in fundamentally different ways. Kammerl's ATM network requires reservation and establishment of a virtual circuit path prior to transmission of voice packets through the virtual

circuit path.  A1227; A1260; A1539.  On the other hand, the connectionless datagram model does not require pre-reservation of a path through the network but requires each individual data packet includes a destination in its header so that each packet can be routed independently through different paths.  Thus, a network configured as an ATM network or the datagram network would require different equipment for routing and transmitting their packets in accordance with the specific internetworking models. A1168, 107:5-11; A1217, Fig. 3.2 ("In a TCP/IP internet, computers called gateways provide all interconnections among all physical networks"); A1548 ("An ATM net is composed of two different devices, the "switch" and the "endpoints").

This misunderstanding or lack of understanding of the different network technologies at the time of the invention undermined the Board's core factual findings that a PHOSITA could (1) substitute Kammerl's broadband virtual circuit ATM network with Iwami's IP-based LAN or (2) modify Iwami's IP-based LAN into a transit network, in such manner that the resulting modified Kammerl-Iwami system is operable and includes the limitations of the claimed invention.

The Board cited no evidence to support this obviousness determination and its technical reasoning lacks support of sound technical principles.  Accordingly, the Board's obviousness determination is erroneous and not supported by substantial evidence.

41

### 6. The Board erred by engaging impermissible hindsight reconstruction of the claimed subject matter

Hindsight is inferred when the specific understanding or principle within the knowledge of one of ordinary skill in the art leading to the modification of the prior art in order to arrive at appellant's claimed invention has not been explained. *In re Rouffet*, 149 F.3d 1350, 1358 (Fed. Cir. 1998). Obviousness determination "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006).

Since the Board's obviousness determination is unsupported by substantial evidence, one would be compelled to conclude that the Board has relied on impermissible hindsight in the selective combination of the disparate network technologies of Kammerl and Iwami. "While the Supreme Court made clear that a mechanical application of the teaching-suggestion-motivation test, requiring an explicit teaching in the prior art, is inappropriate, '[w]e must still be careful not to allow hindsight reconstruction of references to reach the claimed invention without any explanation as to how or why the references would be combined to produce the claimed invention.'" *Kinetics Concept*, 688 F.3d at 1368.

**CONCLUSION**

For the aforementioned reasons, the Board's obviousness conclusion is not supported by substantial evidence.  Patent Owner respectfully requests this Court to reverse the Board's decision that claims 1-7 and 15 are unpatentable over Kammerl and Iwami; that claims 8, 9, and 11-13 are unpatentable over Kammerl, Iwami, and Kobayashi; that claim 10 is unpatentable over Kammerl, Iwami, Kobayashi, and Chau; and that claim 14 is unpatentable over Kammerl, Iwami, and Gordon.

Dated: March 24, 2015              /s/ Chi Eng
                                   Chi Eng
                                   Eng Law Firm
                                   One Gateway Center, Suite 2600
                                   Newark, NJ 07102
                                   Email: chi@englawfirm.com
                                   Telephone: 646-770-2347
                                   Facsimile:  646-568-7231

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that, on this the 24th day of March, 2015, I electronically filed the foregoing Brief of Appellant with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

The necessary filing and service were performed in accordance with the instructions given to me by counsel in this case.

/s/ Melissa A. Dockery
Melissa A. Dockery
GIBSON MOORE APPELLATE SERVICES
421 East Franklin Street, Suite 230
Richmond, VA 23219

**CERTIFICATE OF COMPLIANCE**
**With Type-Volume Limitation, Typeface Requirements,**
**and Type Style Requirements**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

> this brief contains <u>8,601</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

> this brief has been prepared in a proportionally spaced typeface using <u>Microsoft Word</u> in <u>14 Times New Roman</u>.

Dated: March 24, 2015                <u>/s/ Chi Eng</u>
                                     Chi Eng

# ADDENDUM

# TABLE OF CONTENTS
**Addendum to Brief of Appellant**

**Page:**

Final Written Decision
        filed October 8, 2014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  Add. 1

Errata to Final Written Decision of October 8, 2014
        filed March 18, 2015 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 23.1

Decision - Institute Inter Partes Review
        filed October 31, 2013  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 24

U.S. Patent No. 7,724,879 B2
        dated May 25, 2010 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Add. 58

Trials@uspto.gov
571-272-7822

Paper 42
Date: October 8, 2014

## UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

### LEVEL 3 COMMUNICATIONS, LLC,
Petitioner,

v.

### AIP ACQUISITION LLC,
Patent Owner.

_____

Case IPR2013-00296
Patent 7,724,879 B2

_____

Before JAMESON LEE, HOWARD B. BLANKENSHIP, and
JUSTIN BUSCH, *Administrative Patent Judges.*

BUSCH, *Administrative Patent Judge.*

### FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2013-00296
Patent 7,724,879 B2

# I. BACKGROUND

Level 3 Communications, LLC ("Petitioner") filed a Petition[1] (Paper 6, "Pet.") requesting *inter partes* review of claims 1–15 (all the claims) of U.S. Patent No. 7,724,879 B2 ("the '879 patent") under 35 U.S.C. §§ 311–319. On October 31, 2013, the Board instituted an *inter partes* review of claims 1–15 ("the challenged claims") on four asserted grounds of unpatentability ("Dec. on Inst."). Paper 14. Subsequent to institution, AIP Acquisition LLC ("Patent Owner") filed a Patent Owner Response ("PO Resp."). Paper 20. Petitioner filed a Reply ("Pet. Reply") to the Patent Owner Response. Paper 30. Oral hearing was held on July 15, 2014.[2]

The Board has jurisdiction under 35 U.S.C. § 6(c). This final written decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that the challenged claims are unpatentable.

## A. The '879 Patent (Ex. 1001)

The '879 patent relates to methods for allowing "communication between otherwise incompatible communication networks in a manner that is transparent to the calling party." Ex. 1001, 1:61–63. For example, claimed methods allow the Internet, or another data network, to function like a telecommunications network. *Id.* at 6:36–38. Calling parties may dial remote locations for the price of a local access and service fee to have voice conversations with called parties in those locations and to avoid using long distance carriers. *Id.* at 6:38–42. In order to make such calls, a local system

---

[1] We refer to the corrected Petition filed May 29, 2013.
[2] The record includes a transcript of the oral hearing ("Hr'g Tr."). Paper 41.

2

IPR2013-00296
Patent 7,724,879 B2

may be dialed via computer access or a regular telephone, which prompts the calling party for the called party's telephone number or other identification. *Id.* at 6:42–44. The calling party then is connected to the called party over the Internet or another data network, such as by connecting the parties via a node through a local call or through other networks. *Id.* at 6:44–47. For example, a calling party may access a node that converts the telephone transmission (e.g., the voice transmission) into data supported by the network chosen by the node. *Id.* at 6:47–49. In this example, a network may connect to another node proximate to the called party that then converts the data transmission back into a voice communication and converts the voice communication into a local call to the called party with the called party node operated by an independent service provider located elsewhere, such as in another country. *Id.* at 6:49–54.

A method, as recited in the challenged claims, is illustrated by the conceptual block diagram in Figure 9, reproduced below:



Figure 9 provides an overview of the transmission flow between a calling party and a called party. *See id.* at 6:36–56. In Figure 9 of the '879 patent, a

3

IPR2013-00296
Patent 7,724,879 B2

conceptual block diagram depicts the principles of operation of the method, as recited in independent claim 1, for transmitting voice communications between a calling party and a called party over a data network or another network. *Id.* at 4:3–4, 14:27–45. The calling party at calling location 48 transmits a call to calling party access device 12 via intercept 16 over link 50A. *Id.* at 14:62–15:3. Intercept 16 may be part of central local node 18. *Id.* at 15:11–12. Local node 18 receives transmissions from access device 12, converts those transmissions from a first format (e.g., a telecommunication protocol) to "an internet protocol" for transmission over data network 20, and sends the converted transmissions over data network 20 in order to establish and transmit voice communication for a phone call with called party access device 14. *Id.* at Fig. 9.

As an alternative to communicating through data network 20, additional two-way direct link connections 46A–E are depicted. *Id.* at 14:29–36. Through these connections, calling party access device 12 may route communications to called party access device 14 via either communications network 10[3] or another network 200, such as a cellular, Asynchronous Transfer Mode (ATM), or frame relay network. *Id.*; *see also id.* at 7:34–39. Access device 14 may receive the voice communication via a central local node 24 and/or a central office 22. *Id.* at 15:4–8. Central local node 24 and central office 22 may be separate components. *Id.* at 15:12–14. The transmissions are converted from the internet protocol to another format suitable for reception by access device 14, such as the telecommunications

---

[3] In Figure 9 of Ex. 1001, communications network 10 is identified as "voice network 10."

4

IPR2013-00296
Patent 7,724,879 B2

protocol from which the transmissions were originally converted. *See id.* at
4:34–42.

### B. Illustrative Claim

Independent claim 1, which is the only independent claim and is
illustrative of the subject matter, is reproduced below:

> 1. A method for communication between two access
> devices via one or more networks, comprising the steps:
> receiving a transmission in a first format through a first
> communication network from a first access device, the first
> format comprising a telecommunication protocol for
> establishing and transmitting voice communication for a phone
> call in one of a digital telephone network, an analog telephone
> network, and a cellular network;
> performing a first conversion converting the transmission
> from the first format to a second format, the second format
> being an internet protocol;
> sending the converted transmission through a second
> communication network, the second communication network
> being a data network, for reception by a second access device;
> and
> performing a second conversion further converting the
> converted transmission from the second format to a further
> format suitable for the second access device, wherein the first
> access device and the second access device comprise
> telecommunication nodes, and said further format comprises
> said first format or another telecommunication protocol.

### C. Related Proceedings

On May 17, 2012, Patent Owner filed an action against Petitioner
alleging infringement of the '879 patent, *AIP Acquisition LLC v. Level 3
Communications, LLC*, Civ. Action No. 12-617 (D. Del.). Pet. 1. The '879
patent is also involved in the following district court actions: *AIP*

5

IPR2013-00296
Patent 7,724,879 B2

*Acquisition LLC v. iBasis, Inc.*, Civ. Action No. 12-616 (D. Del.); *AIP Acquisition LLC v. Time Warner Cable Inc.*, Civ. Action No. 12-01692 (D. Del.); *AIP Acquisition LLC v. Cox Communications Inc.*, Civ. Action No. 12-01691 (D. Del.); *AIP Acquisition LLC v. Comcast Corp.*, Civ. Action No. 12-01690 (D. Del.); *AIP Acquisition LLC v. Cablevision Systems Corp.*, Civ. Action No. 12-01688 (D. Del.); and *AIP Acquisition LLC v. Charter Communications Inc.*, Civ. Action No. 12-01689 (D. Del.). *See* Pet. 1–2. The '879 patent is also involved in *Cisco Sys., Inc. v. AIP Acquisition LLC*, IPR2014-00247 (PTAB), a currently-pending *inter partes* review.

### D. Asserted Grounds of Unpatentability

The Board instituted *inter partes* review on the following asserted grounds of unpatentability under 35 U.S.C. § 103(a) (Dec. on Inst. 33):

| References | Basis | Challenged Claim(s) |
| --- | --- | --- |
| Kammerl[4] and Iwami[5] | § 103(a) | 1–7 and 15 |
| Kammerl, Iwami, and Kobayashi[6] | § 103(a) | 8, 9, and 11–13 |
| Kammerl, Iwami, Kobayashi, and Chau[7] | § 103(a) | 10 |
| Kammerl, Iwami, and Gordon[8] | § 103(a) | 14 |

---

[4] US 5,051,983, Sept. 24, 1991 (Ex. 1013) ("Kammerl").
[5] US 5,604,737, Feb. 18, 1997 (filed Dec. 13, 1994) (Ex. 1006) ("Iwami").
[6] US 5,337,352, Aug. 9, 1994 (Ex. 1007) ("Kobayashi").
[7] US 5,187,710, Feb. 16, 1993 (Ex. 1008) ("Chau").
[8] US 5,608,786, Mar. 4, 1997 (filed Feb. 13, 1995) (Ex. 1005) ("Gordon").

6

IPR2013-00296
Patent 7,724,879 B2

## II. ANALYSIS

### A. Claim Construction

No terms need to be construed for purposes of this decision and both parties state that claim construction does not affect the issues in this case. Hr'g Tr. 5:6, 28:10–11, 28:19–29:13. Therefore, we do not explicitly construe any term.

### B. Submitted Evidence

#### 1. Kammerl (Ex. 1013)

Kammerl is directed to "a method and a circuit for speech transmission in a broad-band communications network." Ex. 1013, 1:14–16. Kammerl discusses the fact that a broad-band communications network that transmits signals in packets was known and "[t]ransmission of speech signals following dial connections between subscriber's sets is provided in this known system." *Id.* at 1:18–26. Kammerl further discloses that the packet switching network may serve as a transit network when connected between two public switched telephone networks (PSTNs) via interworking units. *Id.* at 5:57–61.

Kammerl explains that lag times occurring in speech transmission (due to packing and depacking times, processing times, and waiting times) over fixed length packet networks were known to negatively affect the quality of speech signal transmissions. *Id.* at 1:29–37. Kammerl further identifies a problem in hybrid networks (those networks that "include analog/digital telephone switching network[s] in addition to broad-band packet switching networks") occurring in a transfer between the networks. *Id.* at 1:37–43. In particular, Kammerl explains that "the transit time of echo signals caused by the hybrid sets can assume a size such that the echo

7

signals are perceived as interference" due to the "lag times in packet switching networks." *Id.* at 1:43–48.

Kammerl acknowledges that one prior art solution to suppressing the echo signals was to include echo suppressors or echo compensators on the transmission lines, but that such circuitry was expensive and, therefore, undesirable in some instances. *Id.* at 1:49–52. Kammerl also recognizes that "there have already been proposals for reducing the lag times in broad-band packet switching networks by filling packets of a fixed length only partially with speech signals in speech signal transmission." *Id.* at 1:53–56.

Kammerl attempts to overcome the identified problems by reducing lag times. *Id.* at 1:57–60. Kammerl's specific invention is directed to a method for reducing the degree of packet filling in order to reduce lag times for telephone connections over the packet exchange network, "whereas the full packet capacity can be utilized for communication signals to be transmitted following connections of other services," reducing or eliminating the need for the echo suppression systems. *Id.* at 1:64–2:10. Kammerl accomplishes this alteration by configuring the network transfer units to insert control signals into signaling packets when establishing a connection between a PSTN and a packet network to indicate that packet filling should be reduced for transmission of speech signal packets in the hybrid connection. *Id.* at 2:11–3:5. Kammerl purports to provide a solution that adds "[o]nly a slight additional control expense" and that requires minimal transmissions of a control signal to adjust packet filling because "only one network transfer unit is included in the control of the transmission of speech signal packets even" in communications networks "in which a packet switching system is inserted as a transit switching system over network

8

transfer units between two telephone exchanges." *Id.* at 2:11, 2:51–65; *see also id.* at 5:57–6:3 (explaining that only the interworking units that receive packets from the packet switching network deliver control signals that may adjust packet filling).

### 2. Iwami (Ex. 1006)

Iwami is directed to a method and system for establishing a connection for voice communication between a terminal connected to a data network and a terminal connected to a PSTN and allowing various communication functions between the two terminals. Ex. 1006, Abstract, 1:55–2:17. Iwami discloses that the data network may support various protocols, including Internet Protocol (IP), such that Iwami may send packets over its network using UDP/IP and TCP/IP. *Id.* at 17:44–58.

### C. Petitioner's Objections to Alleged New Patent Owner Arguments at Oral Hearing

Petitioner objects to various arguments made by Patent Owner at the oral hearing. Specifically, Petitioner's objections are: (1) *Crocs v. International Trade Commission*, 598 F.3d 1294 (Fed. Cir. 2010) was not of record; (2) Patent Owner's arguments regarding unpredictable results constitutes new argument; (3) Patent Owner's description of Mashinsky having invented the use of IP for a low cost, low quality network constitutes new argument; and (4) reference to page 276 of the Peterson reference constitutes new argument. Hr'g Tr. 40–41, 47, 60–61, 64, 71–72, 74.

Patent Owner relies on *Crocs*, for the first time at oral hearing, for having facts similar to the present case. *Id.* at 60–61. Petitioner has had no prior opportunity to review and address the facts and, therefore, we sustain Petitioner's objection.

9

For the first time at oral hearing, Patent Owner argues that the '879 patent discloses unpredictable results and the '879 patent was the first to use IP as a low cost, low quality bridging network between two PSTNs. Parties are not permitted to raise new arguments or evidence at oral hearing. *Office Patent Trial Practice Guide*, 77 Fed. Reg. 48,756, 48,768 (Aug. 14, 2012). Patent Owner asserts that the arguments in contention were presented in response to Petitioner's new argument in Petitioner's Reply. Hr'g Tr. 47–48. According to Patent Owner, Petitioner in its Reply argued that "the '879 patent, itself, was evidence that somehow the IP quality problems were a non-issue." *Id.* at 47. There is, however, no such exception to the rule against asserting new argument during oral argument. Petitioner's objection to Patent Owner's arguments relating to unpredictable results and Mashinsky's invention of the use of IP as a low cost, low quality bridging network between two PSTNs is sustained.

Finally, we overrule Petitioner's objection to Patent Owner's reference to page 276 of the Peterson reference (Ex. 2015). Exhibit 2015 was submitted as evidence with the Patent Owner Response. Page 276 of Exhibit 2015 states that "one of the biggest challenges [for IP] will be to provide quality or service guarantees that are suitable for high-quality voice and video, [which] is likely to be available in ATM networks from the outset" and that "IP, at present, . . . is best suited to those [applications] without real-time constraints." Patent Owner merely refers to a plain statement on a page of Peterson that was previously provided to Petitioner, in support of Patent Owner's pre-existing argument that Kammerl was concerned with providing high quality voice service, beyond the capability of IP. *See, e.g.*, PO Resp. 5, 15–19, 29–30, 41–43.

10

IPR2013-00296
Patent 7,724,879 B2

### D. Alleged New Arguments in Petitioner's Reply

As discussed above, Patent Owner asserts Petitioner presented a new argument in its Reply regarding whether the '879 patent's failure to address the issues of sending voice data over IP provides support for Petitioner's position that IP quality problems were not an issue at the time of invention of the '879 patent. Hr'g Tr. 47–48. However, Petitioner's argument was raised in response to Patent Owner's allegations of a teaching away and, thus, was properly responsive to argument raised in the Patent Owner Response.

### E. Section 103(a) Patentability

First, we address the limitations of each of the claims as set forth in Petitioner's challenge in sections 1–4 below. In section 5, we address Petitioner's rationale for combining the references and Patent Owner's argument that Kammerl cannot be combined with Iwami.

#### 1. Subject Matter of Claims 1–7 and 15

The Board instituted trial on Petitioner's challenge of obviousness of claims 1–7 and 15 over Kammerl and Iwami. Dec. on Inst. 21–28. Petitioner relies on Kammerl as teaching each limitation of independent claim 1 except for the limitation reciting "the second format being an internet protocol." Pet. 47–52. As discussed above, Kammerl discloses a method and system for transmitting voice signals, including using a packet network as a transit network between two PSTNs. Ex. 1013, 5:57–61. Petitioner argues that Kammerl teaches each of the limitations of independent claim 1 except for using an internet protocol because Kammerl discloses receiving a transmission from a first device connected to a PSTN in a format used by an analog or digital phone network, converting the

11

transmission to a second format used by Kammerl's ATM network, sending the converted transmission across the ATM network, and, in the case where the packet network serves as a transit network, converting the transmission back to a format used by an analog or digital phone network. Pet. 47–52.

Petitioner argues Iwami teaches a second format that is an internet protocol because Iwami discloses, as discussed above, a system that sends voice transmissions between a network using IP and a phone network. *Id.* at 49–50. Petitioner provides claim charts and explanations demonstrating where each of the limitations of claims 1–7 and 15, other than "the second format being an internet protocol," is taught by Kammerl. *Id.* at 47–55. Petitioner asserts Iwami teaches "the second format being an internet protocol" and, in addition to Kammerl, teaches "the second conversion is performed at the second access device," as recited in claim 6. *Id.* at 23–24, 41–42, 49, 54.

Patent Owner does not dispute that Kammerl and Iwami teach the limitations for which Petitioner cites each reference. Having reviewed the evidence of record, we are persuaded Petitioner has demonstrated that Kammerl and Iwami teach the limitations recited in claims 1–7 and 15.

## 2. Subject Matter of Claims 8, 9, and 11–13

The Board instituted trial on Petitioner's challenge of obviousness of claims 8, 9, and 11–13 over Kammerl, Iwami, and Kobayashi. Dec. on Inst. 28–30. Petitioner asserts Kobayashi teaches the additional limitations recited in dependent claims 8, 9, 11, and 13 related to routing based on user preferences because "Kobayashi teaches a method of improving transmission quality by routing on the basis of the recorded preferences of users of the network." Pet. 56 (citing Ex. 1007, 3:20–25); *id.* at 25–27, 28–

12

IPR2013-00296
Patent 7,724,879 B2

29, 56–58. Petitioner further contends Kammerl teaches "the transmission comprises execution of a call setup procedure," as recited in dependent claim 12 because Kammerl discloses "call setup procedures that involve inserting signaling procedure signals from subscriber[s'] sets into packets and relaying them between the subscriber[s'] sets." Pet. 57. Petitioner provides claim charts demonstrating where each of the additional limitations of claims 8, 9, and 11–13 is taught by the references. *Id.* at 25–29, 56–58.

Patent Owner does not dispute that Kammerl, Iwami, and Kobayashi teach the limitations for which Petitioner cites each reference. Having reviewed the evidence of record, we are persuaded Petitioner has demonstrated that Kammerl, Iwami, and Kobayashi teach the limitations recited in claims 8, 9, and 11–13.

### 3. *Subject Matter of Claim 10*

The Board instituted trial on Petitioner's challenge of obviousness of claim 10 over Kammerl, Iwami, Kobayashi, and Chau. Dec. on Inst. 30–31. Petitioner argues Chau teaches "wherein the at least one criteria comprises credit availability of a calling party," as recited in dependent claim 10 because Chau discloses performing a credit check on callers. Pet. 29, 58. Petitioner provides a claim chart demonstrating where the additional limitation of claim 10 is found in Chau. *Id.* at 29.

Patent Owner does not dispute that Kammerl, Iwami, Kobayashi, and Chau teach the limitations for which Petitioner cites each reference. Having reviewed the evidence of record, we are persuaded Petitioner has demonstrated that Kammerl, Iwami, Kobayashi, and Chau teach the limitations recited in claim 10.

13

IPR2013-00296
Patent 7,724,879 B2

### 4. Subject Matter of Claim 14

The Board instituted trial on Petitioner's challenge of obviousness of claim 14 over Kammerl, Iwami, and Gordon. Dec. on Inst. 31–32. Petitioner argues Gordon teaches a transmission "related to a fax transmission," as recited in dependent claim 14 because Gordon discloses sending a fax transmission over a data network. Pet. 20–21, 58–59. Petitioner provides a claim chart demonstrating where the additional limitation of claim 14 is found in Gordon. *Id.* at 20–21.

Patent Owner does not dispute that Kammerl, Iwami, and Gordon teach the limitations for which Petitioner cites each reference. Having reviewed the evidence of record, we are persuaded Petitioner has demonstrated that Kammerl, Iwami, and Gordon teach the limitations recited in claim 14.

### 5. Combinability of Cited Art

Petitioner argues Kammerl teaches the general concept of using a data network as a transit network between two PSTNs (Pet. Reply 3–6), including sending, receiving, and converting transmissions in such a hybrid network. Pet. 47–59. Thus, as discussed above, Petitioner asserts Kammerl teaches each limitation of independent claim 1 except for the limitation of "the second format being an internet protocol," Iwami teaches a second format that is an internet protocol, and it would have been obvious to a person of ordinary skill in the art to use the Internet Protocol taught by Iwami in the network topology taught by Kammerl. *Id.* at 47–52. Petitioner argues a person having ordinary skill in the art ("PHOSITA"), at the time of invention of the '879 patent, would have combined Kammerl and Iwami to allow "voice communications to be transmitted on networks other than ATM

14

networks[, which] is the reason that internetworking or internet protocols such as the Internet Protocol were developed—to allow internetworking of diverse networks." *Id.* at 49.

Patent Owner acknowledges that one teaching of Kammerl is a "generic network topo[logy] that shows a packet switch[ed] network . . . serving as a bridging network between PSTN to PSTN." Hr'g Tr. 31:18–21. However, Patent Owner argues that Kammerl's purpose is to reduce lag times when transmitting voice packets over a data network in order to improve the transmission quality and reduce the need for expensive echo-cancellation equipment. PO Resp. 30. Patent Owner further argues Kammerl was designed to meet the high quality of service levels required by traditional PSTN customers (*see, e.g.*, Hr'g Tr. 32, 35, 37–39) and that IP "was not capable of providing high quality voice services" in 1996. *Id.* at 40 (quoting Ex. 2015, 276 ("For IP, one of the biggest challenges will be to provide quality of service guarantees that are suitable for high quality voice and video, something that is likely to be available in ATM networks from the outset")). Thus, Patent Owner contends that a PHOSITA would not have used Iwami's IP over Kammerl's ATM network, or substituted Iwami's packet network using IP for Kammerl's ATM network, because the teachings of Kammerl outweigh the asserted benefit of internetworking provided by Iwami. PO Resp. 28–53. Specifically, Patent Owner argues that Kammerl teaches away "from implementations that would introduce lag" and that using IP over an ATM network (or substituting Iwami's IP network for Kammerl's ATM network) necessarily introduces delays associated with processing (i.e., reassembly and segmentation) the data

15

IPR2013-00296
Patent 7,724,879 B2

packets at each router the packets encounter, rendering Kammerl inoperable. *Id.* at 32–41, 52–53.

Petitioner responds that Patent Owner focuses on one particular teaching of Kammerl and ignores Kammerl's broader teaching that a data network can be used as a transit network between two PSTNs. Pet. Reply 5–6. Petitioner asserts that, even assuming using IP for voice transmission with reduced packet filling according to Kammerl's specific invention would increase delay, Kammerl's teachings as a whole must be considered rather than focusing on one particular teaching. *Id.* at 12–13 (citing *In re Heck*, 699 F.2d 1331, 1333 (Fed. Cir. 1983); *see also EWP Corp. v. Reliance Universal Inc.*, 755 F.2d 898, 907 (Fed. Cir. 1985) ("A reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect."). Petitioner also argues that Patent Owner's examples of how the combination of Iwami and Kammerl would introduce delay actually demonstrates that the combination does work, refuting Patent Owner's argument that the combination would be inoperative or nonfunctional. Pet. Reply 13–14.

As an initial matter, we note that the challenged claims have a broad scope. For example, independent claim 1 is directed to a method comprising receiving a transmission in a telecommunication protocol format, converting the transmission into an internet protocol format, sending the transmission through a data network, and converting the transmission into a telecommunication protocol format.

Claims 2–7, 12, 14, and 15 further define details relating to where certain method steps occur and the types of communications, parties, networks, and devices involved in a transmission. Claim 8 recites an

16

IPR2013-00296
Patent 7,724,879 B2

additional step of routing based on criteria defined by user preferences and claims 9–11 further define the criteria used in routing decisions. Claim 13 recites an additional step of storing information related to the transmission.

As discussed above, independent claim 1 of the '879 patent differs from Kammerl only in that the data network disclosed by Kammerl does not use an internet protocol and, thus, Kammerl does not disclose that the recited second format is an internet protocol. With respect to Iwami, independent claim 1 of the '879 patent differs from Iwami in that Iwami only discloses a single conversion from a telecommunication protocol to an internet protocol. Iwami does not disclose performing the recited second conversion.

We are not persuaded by Patent Owner's argument that Kammerl's focus on reducing lag results in a teaching away from any combination that would increase lag times. *See* PO Resp. 41–43. Patent Owner does not point to, nor do we see, anything in Kammerl that "criticize[s], discredit[s], or otherwise discourage[s] the solution claimed in the" '879 patent or otherwise rises to the level of a teaching away. *In re Fulton*, 391 F.3d 1195, 1201 (Fed. Cir. 2004). Moreover, while Kammerl's purpose was to speed up transmission of voice data over an ATM network and may have provided a high quality of service intended to meet standards demanded by traditional PSTN customers, nothing recited in the broad claims of the '879 patent requires a system meeting such quality standards.[9]

Furthermore, there is nothing in Kammerl stating that a network using an internet protocol would not function as a transit network between two

---

[9] Claim 9 broadly recites that a route for transmission is selected based on a user-specified level of transmission quality, but does not recite any limitation that would preclude a PHOSITA from considering the use of IP.

17

IPR2013-00296
Patent 7,724,879 B2

PSTNs. In fact, Kammerl's invention is directed specifically to an improvement on ATM or fixed-length packet networks. Kammerl never mentions, and thus, never criticizes, discredits, or otherwise discourages, using a network with messages formatted in an internet protocol as a transit network between two PSTNs.

Patent Owner focuses on what Kammerl's goals and considerations were at the time of Kammerl's invention. However, for purposes of an obviousness analysis, we look to what a PHOSITA would have considered obvious when looking to the relevant art, including Kammerl and Iwami, and whether that PHOSITA would have found it obvious to combine the teachings found in the art to result in the claimed invention at the time of invention of the '879 patent.

Regarding Patent Owner's teaching away argument, we look to whether the references teach away from the broad challenged claims. *See In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("a reference will teach away if it suggests that the line of development flowing from the reference's disclosure is unlikely to be *productive of the result sought by the applicant*") (emphasis added). Patent Owner admits that the '879 patent uses IP for applications where it is acceptable to have low quality. Hr'g Tr. 45:17–46:3, 46:20–47:16.

Regardless of whether a transit network using IP would have met the high quality of service expected by PSTN to PSTN customers, a PHOSITA would have at least considered an internet protocol, such as the IP network disclosed in Iwami, as an obvious choice for a protocol to transmit voice data between two PSTNs. The PHOSITA would have considered it obvious to use such a design for applications where a lower quality of service was

18

acceptable. Even if the PHOSITA would have concluded that such a design would not suffice for certain applications[10] or would not have been commercially successful, it would have been an obvious to that PHOSITA that combining Kammerl and Iwami would result in an operable system.

Patent Owner points to evidence indicating that "one of the biggest challenges" for IP around the time of the invention would be "to provide quality of service guarantees that are suitable for high-quality voice and video." *Id.* at 40 (quoting Ex. 2015, 276). Although Patent Owner's evidence indicates that the IP community faced challenges to provide Quality of Service *guarantees* for high-quality voice and video, that evidence indicates those skilled in the art were considering using IP for *high-quality* voice applications. Moreover, that evidence provides little insight as to whether a PHOSITA would have considered it obvious to use IP in a bridging network between two PSTNs in applications where Quality of Service guarantees were not important.

Furthermore, we do not find Patent Owner's argument that Petitioner was unable to identify a single "patent or reference that disclosed . . . IP as a bridging network between PSTN-to-PSTN calls" persuasive. Hr'g Tr. 39. Petitioner's challenges to the claims of the '879 patent are not based on anticipation under 35 U.S.C. § 102, but obviousness under 35 U.S.C. § 103(a).

In light of the scope of the claims, the differences between the recited claims and the cited references, and the state of the art at the time of

---

[10] We find Patent Owner's argument that, in 1996, it was known that IP "was ill-suited for real[-]time applications like voice" supports a finding that using IP as a transit network, even if less than ideal, would have been obvious.

19

IPR2013-00296
Patent 7,724,879 B2

invention of the '879 patent[11], we find the rationale provided by Petitioner for combining Kammerl and Iwami to be persuasive. The Petitioner has established that a PHOSITA, at the time of invention of the '879 patent, would have been aware of both Kammerl's disclosure of transmitting voice between two PSTNs using an ATM network as a transit network and Iwami's disclosure of transmitting voice between an IP network and a phone network.

We find a PHOSITA would have considered using an IP network as a transit network between two PSTNs in order to provide the benefits of simpler internetworking of diverse networks, even at the expense of potentially slower transit speeds. Ex. 1002 ¶ 227. Additionally, we also find persuasive Petitioner's contention that "an internet protocol network [was] one of a finite number of identified communications mechanisms that were well-known at the time." *Id.* ¶ 229. Thus, even if a PHOSITA would have considered the benefits of using IP as a protocol for a transit network between two PSTNs to not be worth the tradeoff in transit time, the Petition establishes that modifying Kammerl to use an internet protocol as taught by Iwami would have been obvious to that PHOSITA. Therefore, we find Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have combined Kammerl and Iwami and that the combination of Kammerl and Iwami teaches the subject matter recited in claims 1–7 and 15.

---

[11] Mr. Stephen B. Weinstein (declarant for Patent Owner) and Dr. Vincent C. Jones (declarant for Petitioner) both indicated that the Internet and IP were "coming to prominence from 1994 through 2001." Ex. 1022. 18:15–21; *see also* Ex. 1002 ¶¶ 30–32.

20

Petitioner argues that incorporating each of Kobayashi, Chau, or Gordon with Kammerl's teachings is merely applying well-known techniques to Kammerl in a known way to achieve predictable results. Pet. 56, 58, 59. We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have combined Kobayashi with Kammerl and Iwami and that such a combination teaches the subject matter recited in claims 8, 9, and 11–13. We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have combined Chau with Kammerl, Iwami, and Kobayashi and that such a combination teaches the subject matter recited in claim 10. We are persuaded that Petitioner has demonstrated by a preponderance of the evidence that one of ordinary skill in the art would have combined Gordon with Kammerl and Iwami and that such a combination teaches the subject matter recited in claim 14.

## III. CONCLUSION

Petitioner has demonstrated by a preponderance of the evidence that: claims 1–7 and 15 are unpatentable over Kammerl and Iwami; claims 8, 9, and 11–13 are unpatentable over Kammerl, Iwami, and Kobayashi; claim 10 is unpatentable over Kammerl, Iwami, Kobayashi, and Chau; and claim 14 is unpatentable over Kammerl, Iwami, and Gordon.

IPR2013-00296
Patent 7,724,879 B2

## IV. ORDER

In consideration of the foregoing, it is:

ORDERED that claims 1–15 of the '067 patent are held *unpatentable*; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

22

IPR2013-00296
Patent 7,724,879 B2

For Patent Owner:

Michael Ray
Jon Wright
David Clonts
mray-ptab@skgf.com
jwright-ptab@skgf.com
dclonts@akingump.com


For Petitioner:

Robert Devoto
John Phillips
Karl Renner
Jason Wolffe
Dan Smith
devote@fr.com
phillips@fr.com
axf@fr.com
wolff@fr.com
dcs@fr.com

23

Trials@uspto.gov
571-272-7822

Paper 53
Date: March 18, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

LEVEL 3 COMMUNICATIONS, LLC,
Petitioner,

v.

AIP ACQUISITION LLC,
Patent Owner.

————————

Case IPR2013-00296
Patent 7,724,879 B2

————————

ERRATA

The Final Written Decision, Paper 43, which was entered on
October 8, 2014 contained an error.  On page 22, in the "IV. Order" section,
the "ORDERED" line should have read: "ORDERED that claims 1-15 of the
'879 patent are *unpatentable*."

/Amy Kattula/
Paralegal Specialist

IPR2013-00296
Patent 7,724,879 B2

For Patent Owner:

Michael Ray
Mray-ptab@skgf.com

Jon Wright
Jwright-ptab@skgf.com

David Clonts
dclonts@akingump.com

For Petitioner:

Chi Eng
chi@englawfirm.com

Alfred Froebrich
afroebrich@lmiplaw.com

2

Trials@uspto.gov                                              Paper 14
Tel: 571-272-7822                            Entered: October 31, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

————————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————————

LEVEL 3 COMMUNICATIONS, LLC
Petitioner

v.

AIP ACQUISITION, LLC
Patent Owner

————————————

Case IPR2013-00296
Patent 7,724,879 B2

————————————

Before HOWARD B. BLANKENSHIP, JUSTIN T. ARBES, and
JAMES B. ARPIN, *Administrative Patent Judges.*

ARPIN, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

Case IPR2013-00296
Patent 7,724,879 B2

## I.    INTRODUCTION

Level 3 Communications, LLC ("Petitioner") filed a petition to
institute an *inter partes* review of claims 1-15 (Paper 6; "Pet.") of Patent No.
US 7,724,879 B2 (Ex. 1001; "the '879 Patent").  AIP Acquisition, LLC
("Patent Owner") filed a patent owner preliminary response (Paper 13;
"Prelim. Resp.").  We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in
35 U.S.C. § 314(a) which provides as follows:

> THRESHOLD.—The Director may not authorize an *inter
> partes* review to be instituted unless the Director determines
> that the information presented in the petition filed under
> section 311 and any response filed under section 313 shows that
> there is a reasonable likelihood that the petitioner would prevail
> with respect to at least 1 of the claims challenged in the
> petition.

Upon consideration of the petition and patent owner preliminary
response, we determine that the information presented in the petition
establishes that there is a reasonable likelihood that Petitioner would prevail
with respect to claims 1-15 of the '879 Patent.  Accordingly, pursuant to
35 U.S.C. § 314, we authorize an *inter partes* review to be instituted as to
claims 1-15 of the '879 Patent.

### A.    Related Proceedings

The '879 Patent is involved in concurrent district court litigation.
On May 17, 2012, Patent Owner filed an action against Petitioner alleging
infringement of the '879 Patent, *AIP Acquisition LLC v. Level 3*

2

Case IPR2013-00296
Patent 7,724,879 B2

*Communications, LLC*, Civ. Action No. 12-617 (D. Del.).  Petitioner was served with the complaint in this action on May 21, 2012.  Related district court litigation regarding the '879 Patent is:  *AIP Acquisition LLC v. iBasis, Inc.*, Civ. Action No. 12-616  (D. Del.), filed May 17, 2012; *AIP Acquisition LLC v. Time Warner Cable Inc., et al.,* Civ. Action No. 12-01692 (D. Del.), filed December 11, 2012; *AIP Acquisition LLC v. Cox Communications Inc., et al.*, Civ. Action No. 12-01691 (D. Del.), filed December 11, 2012; *AIP Acquisition LLC v. Comcast Corporation, et al.*, Civ. Action No. 12-01690 (D. Del.), filed December 11, 2012; *AIP Acquisition LLC v. Cablevision Systems Corporation, et al.*, Civ. Action  No. 12-01688 (D. Del.), filed December 11, 2012; and *AIP Acquisition LLC v. Charter Communications Inc., et al.*, Civ. Action No. 12-01689 (D. Del.), filed December 11, 2012. *See* Pet. 1-2.

### B.    The '879 Patent

The '879 Patent relates to methods for allowing telecommunications services to operate over telecommunications networks (e.g., the Public Switched Telephone Network or "PSTN") and data networks (e.g., digital networks).  Prelim. Resp. 2-3.  For example, claimed methods allow the Internet, or another data network, to function like a telecommunications network.  Ex. 1001, col. 6, ll. 36-38.  Calling parties may dial remote locations for the price of a local access and service fee to have voice conversations with called parties in those locations and to avoid using long distance carriers.  *Id.* at ll. 38-42.  In order to make such calls, a local system

3

Case IPR2013-00296
Patent 7,724,879 B2

may be dialed via computer access or a regular telephone, which prompts the
calling party for the called party's telephone number or other identification.
*Id*. at ll. 42-44.  The calling party then is connected to the called party over
the Internet or another data network, such as by connecting the parties via a
node through a local call or through other networks.  *Id.* at ll. 44-47.  For
example, a calling party may access a node that converts the telephone
transmission (e.g., the voice transmission) into data supported by the
network chosen by the node.  *Id.* at ll. 47-49.  In this example, a network
may connect to another node proximate to the called party that then converts
the data transmission back into a voice communication and converts the
voice communication into a local call to the called party with the called
party node operated by an independent service provider located elsewhere,
such as in another country.  *Id.* at ll. 49-54.

   A method, as recited in the challenged claims, is illustrated by the
conceptual block diagram in Figure 9, reproduced below:

4

Case IPR2013-00296
Patent 7,724,879 B2



In Figure 9 of the '879 Patent, a conceptual block diagram depicts the
principles of operation of the method, as recited in independent claim 1, for
transmitting voice communications between a calling party and a called
party over a data network or another network. *Id*. at col. 4, ll. 3-4; col. 14,
ll. 27-45. The block diagram of Figure 9 provides an overview of the
transmission flow between a calling party and a called party. *See id*. at col. 6,
ll. 36-56. The calling party at a calling location 48 transmits a call to a
calling party access device 12 via an intercept 16 over link 50A. *Id*. at col.
14, l. 62-col. 15, l. 3. Intercept 16 may be part of a central local node 18. *Id*.
at col. 15, ll. 11-12. Local node 18 receives transmissions from access
device 12, converts those transmissions from a first format (e.g., a

5

Case IPR2013-00296
Patent 7,724,879 B2

telecommunication protocol) to "an internet protocol" for transmission over a data network 20, and sends the converted transmissions over the data network 20 in order to establish and transmit voice communication for a phone call with a called party access device 14. *Id.* at Fig. 9.

As an alternative to communicating through data network 20, additional two-way direct link connections 46A-E are depicted. *Id.* at col. 14, ll. 29-36. Through these connections, calling party access device 12 may route communications to called party access device 14 via either a communications network 10[1] or another network 200, such as a cellular, Asynchronous Transfer Mode (ATM), or frame relay network. *Id.*; *see also* Ex. 1001, col. 7, ll. 34-39.

Access device 14 may receive the voice communication via a central local node 24 and/or a central office 22. *Id.* at col. 15, ll. 4-8. Central local node 24 and central office 22 may be separate components. *Id.* at col. 15, ll. 12-14. The transmissions are converted from the internet protocol to another format suitable for reception by access device 14, such as the telecommunications protocol from which the transmissions were originally converted. *See id.* at col. 4, ll. 34-42.

---

[1] In Figure 9 of Ex. 1001, communications network 10 is described as "voice network 10."

6

Case IPR2013-00296
Patent 7,724,879 B2

*C.    Illustrative Claim*

Challenged claim 1 is independent. Challenged claims 2-15 depend, directly or indirectly, from independent claim 1. Claim 1 is illustrative and is reproduced below:

> 1. A method for communication between two access devices via one or more networks, comprising the steps:

> receiving a transmission in a first format through a first communication network from a first access device, the first format comprising a telecommunication protocol for establishing and transmitting voice communication for a phone call in one of a digital telephone network, an analog telephone network, and a cellular network;

> performing a first conversion converting the transmission from the first format to a second format, the second format being an internet protocol;

> sending the converted transmission through a second communication network, the second communication network being a data network, for reception by a second access device; and

> performing a second conversion further converting the converted transmission from the second format to a further format suitable for the second access device, wherein the first access device and the second access device comprise telecommunication nodes, and said further format comprises said first format or another telecommunication protocol.

7

Case IPR2013-00296
Patent 7,724,879 B2

### D.    References Relied Upon

Petitioner relies upon the following references:

| | | | |
|---|---|---|---|
| Gordon | US 5,608,786 | Mar. 4, 1997 (filed Feb. 13, 1995) | (Ex. 1005) |
| Iwami | US 5,604,737 | Feb. 18, 1997 (filed Dec. 13, 1994) | (Ex. 1006) |
| Kobayashi | US 5,337,352 | Aug. 9, 1994 | (Ex. 1007) |
| Chau | US 5,187,710 | Feb. 16, 1993 | (Ex. 1008) |
| Kammerl | US 5,051,983 | Sep. 24, 1991 | (Ex. 1013) |

Ian Merritt, PROVIDING TELEPHONE LINE ACCESS TO A PACKET VOICE NETWORK at 1-15 (1983) (available at Defense Technical Information Center, Accession Number ADA 126270) (Ex. 1009);

S. Casner *et al.*, *Wideband Communication*, 1982 ANNUAL TECHNICAL REPORT: RESEARCH PROGRAM IN COMPUTER TECHNOLOGY, March 1983 at 1-11, 85-97 (available at National Technical Information Service, Product Code ADAl27288) (Ex. 1010);

G.C. O'Leary *et al.*, *A Modular Approach To Packet Voice Terminal Hardware Design*, 50 AFIPS CONFERENCE PROCEEDINGS, May 1981 at 183-188 (Ex. 1011);

Clifford J. Weinstein *et al.*, *Experience With Speech Communication In Packet Networks*, 1 IEEE JOURNAL ON SELECTED AREAS IN COMMUNICATIONS, SPECIAL ISSUE ON PACKET SWITCHED VOICE AND DATA COMMUNICATIONS, 963-980 (1983) (Ex. 1012);

T. Ramteke, NETWORKS, 3, 4, 10, 58-60, 136-138, 245-247, 292-293, and 384 (1984) (Ex. 1014);

8

Case IPR2013-00296
Patent 7,724,879 B2

D. Cohen, RFC 741—Specifications for the Network Voice Protocol (NVP), Nov. 22, 1977. (Ex. 1015);

NSF Network News, *NSFNET Acceptable Use Policy*, National Science Foundation, Washington, D.C., 4 and 11, available at http://old.cni.org/docs/infopols/NSF.html (Ex. 1016);

S. Halabi, INTERNET ROUTING ARCHITECTURES, i-x, and 5-35 (2nd ed. 2000) (Ex. 1017);

NEWTON'S TELECOM DICTIONARY, 30, 211, 554, 643, 706, 827, 933, and 1014 (1994) (Ex. 1018); and

R.F. Rey, ENGINEERING AND OPERATIONS IN THE BELL SYSTEM, 52-56 (2nd ed. 1983) (Ex. 1019).

E.    *The Asserted Grounds*

Petitioner alleges that claims 1-9 and 11-15 are anticipated under 35 U.S.C. § 102(e) by Gordon, and claims 1-15 are unpatentable under 35 U.S.C. § 103(a) based upon the listed references in various combinations. The specific grounds asserted by Petitioner are detailed in the table below:

| Claims | Statutory Basis | Applied Reference(s) |
|---|---|---|
| 1-9 and 11-15 | 35 U.S.C. § 102(e) | Gordon |
| 6 | 35 U.S.C. § 103(a) | Gordon and Iwami |
| 8, 9, 11, and 12 | 35 U.S.C. § 103(a) | Gordon and Kobayashi |
| 10 | 35 U.S.C. § 103(a) | Gordon, Kobayashi, and Chau |
| 1-8, 12, 14, and 15 | 35 U.S.C. § 103(a) | Merritt, Casner, O'Leary, and Weinstein |
| 1-8, 12, and 15 | 35 U.S.C. § 103(a) | Merritt, Casner, O'Leary, Weinstein, and Iwami |

9

Case IPR2013-00296
Patent 7,724,879 B2

| 8, 9, and 11-13 | 35 U.S.C. § 103(a) | Merritt, Casner, O'Leary, Weinstein, and Kobayashi |
| 10 | 35 U.S.C. § 103(a) | Merritt, Casner, O'Leary, Weinstein, Kobayashi, and Chau |
| 1-7 and 15 | 35 U.S.C. § 103(a) | Kammerl and Iwami |
| 8, 9, and 11-13 | 35 U.S.C. § 103(a) | Kammerl, Iwami, and Kobayashi |
| 10 | 35 U.S.C. § 103(a) | Kammerl, Iwami, Kobayashi, and Chau |
| 14 | 35 U.S.C. § 103(a) | Kammerl, Iwami, and Gordon |

## II.    CLAIM CONSTRUCTION

In an *inter partes* review, "[a] claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b); *see also Office Patent Trial Practice Guide*, 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012) (*Claim Construction*). Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Nevertheless, a "claim term will not receive its ordinary meaning if the patentee acted as his own lexicographer and clearly set forth a definition of the disputed claim term in either the specification or

10

Case IPR2013-00296
Patent 7,724,879 B2

prosecution history." *Id*. Any special definition for a claim term must be set

forth in the specification with reasonable clarity, deliberateness, and

precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). In the

absence of such a special definition or other consideration, "limitations are

not to be read into the claims from the specification." *In re Van Geuns*, 988

F.2d 1181, 1184 (Fed. Cir. 1993).[2]

Petitioner and Patent Owner propose particular constructions for

several claim terms. Patent Owner states that two of its proposed

constructions differ materially from those proposed by Petitioner. *See, e.g.*,

Prelim. Resp. 4. Patent Owner contends that, given the interpretation of

certain claim terms, Gordon alone does not disclose each and every element

of challenged claims 1-9 and 11-15 and that the asserted combinations of the

applied references would not have taught or suggested all of the limitations

of challenged claims 1-15. *Id*. at 1. In particular, Patent Owner contends

that, in view of the interpretation of the claim terms "internet protocol" and

"signaling message," the challenged claims are neither anticipated nor

rendered unpatentable by the applied art. *Id*. To determine whether to

institute an *inter partes* review, we construe the claim terms that Patent

-----

[2] We note that the '879 Patent is set to expire on October 11, 2014. While
the Board applies the broadest reasonable interpretation standard to the
claims of an unexpired patent, the claim interpretation standard for an
expired patent may be different. *See In re Rambus Inc.*, 694 F.3d 42, 46
(Fed. Cir. 2012) ("the Board's review of the claims of an expired patent is
similar to that of a district court's review").

11

Case IPR2013-00296
Patent 7,724,879 B2

Owner relies upon to distinguish the challenged claims over the applied

references and to which terms Petitioner ascribes alternative constructions.

*A.    An internet protocol*

Claim 1 recites that the claimed method comprises the step of

"performing a first conversion converting the transmission from the first

format to a second format, *the second format being an internet protocol*."

Claim 1 further recites that this second format is for sending the converted

transmission through a second communication network (i.e., a data

network). The Specification of the '879 Patent does not define expressly the

term "internet protocol."  Nevertheless, referring to Figure 2, the

Specification states that:

> Both servers 60, 62 are networked *using transmission control*
> *protocol/Internet protocol TCP/IP, which is a set of protocols*
> *that link dissimilar computers across a variety of other*
> *networks and protocols as conventionally used on local area*
> *networks, minicomputers and mainframes*, or are networked
> with a router in the case of an ATM.

Ex. 1001, col. 7, ll. 45-50 (emphasis added).  Thus, internet protocols, such

as TCP/IP, link computers across a variety of networks and protocols and are

an alternative to protocols used with an ATM network.  The Specification

further explains that:

> Other applications of the invention concern transmissions
> through conventional switched frame relay, conventional
> switched asynchronous transfer mode and other conventional

12

Case IPR2013-00296
Patent 7,724,879 B2

> data networks such as the Internet. Frame relay is an
> international standard for efficiently handling high-speed data
> over wide area networks that uses network bandwidth only
> when there is traffic to send. Asynchronous transfer mode
> allows users to combine voice, video and data on a single phone
> line and operates at up to Gigabyte-per-second speeds in which
> usable capacity is segmented into fixed-size cells each
> consisting of header and information fields allocated to services
> on demand. *The Internet network differs from frame relay
> switching and asynchronous transfer mode [ATM] by using
> internet protocols* such as transmission control protocol/Internet
> protocol (TCP/IP), which is a set of protocols developed by the
> Department of Defense to link dissimilar computers across a
> variety of other networks and protocols.

Ex. 1001, col. 7, ll. 23-39 (emphasis added).  Moreover, as noted above,

with respect to Figure 9, the Specification distinguishes between the

conversion of telecommunication transmissions for transmission over a data

network, such as data network 20, and for transmission over another

network 200, such as a cellular, ATM, or frame relay network.  *Id.* at col. 14,

ll. 29-36.

Relying upon the Declaration of Dr. Vincent C. Jones (Ex. 1002),

Petitioner proposes a broad construction of the term "internet protocol."

Pet. 7-8 (citing Ex. 1002 ¶¶ 39-41).  Specifically, Petitioner argues that the

term "internet protocol" means "a set of rules, procedures or conventions

relating to format and timing of data that allows communications between

networks."  *Id.* at 7 (quoting Ex. 1002 ¶ 41).  Although Dr. Jones

acknowledges that the Specification indicates that an Internet network

"differs" from frame relay switching and ATM "by using internet protocols"

13

Case IPR2013-00296
Patent 7,724,879 B2

(Ex. 1002 ¶ 39 (quoting Ex. 1001, col. 7, ll. 34-39)), Dr. Jones relies instead
upon the definitions of the words "internetworking" and "protocol" (*see id.*
at ¶ 40 (citing Ex. 1014 and Ex. 1018)) in formulating Petitioner's
construction of the term "internet protocol." We disagree with this
construction, as it is overly broad and fails to take proper account of the
Specification.

Patent Owner contends that, in view of the Specification, the term
"internet protocol" must be construed to "satisfy three requirements: (1) that
it be the type of protocol used on the Internet; (2) that it include TCP/IP; and
(3) that it ***not*** be an ATM or a frame relay protocol." Prelim. Resp. 8-9.
Patent Owner relies on extrinsic evidence (Prelim. Resp. 8-10 (citing Ex.
2002 and Ex. 2003)) to conclude that the term "datagram protocol" satisfies
these requirements and that "the broadest reasonable interpretation of 'an
internet protocol' in the context of the '879 patent is simply 'a datagram
protocol'" (*id.* at 7-8). We note, however, that the term "datagram protocol"
does not appear in the Specification, and we determine that it is unnecessary
to introduce this new term in order to construe the term "internet protocol."

We are persuaded that based on the term's usage in the Specification,
an "internet protocol" must satisfy the three requirements identified by
Patent Owner. *Id.* at 8-9. Moreover, as Petitioner notes, the ordinary
meaning of the term "protocol" is "a specific set of rules, procedures or
conventions relating to format and timing of data transmission between two
devices." Ex. 1002 ¶ 37 (quoting Ex. 1018, p. 827). Therefore, for

14

Case IPR2013-00296
Patent 7,724,879 B2

purposes of this decision, we construe the term "internet protocol" as a set of
rules, instructions, or procedures relating to the format and timing of data
transmissions between two devices over the Internet, such as TCP/IP.  The
term "internet protocol," as used in the claims of the '879 Patent, does *not*
encompass ATM and frame relay protocols.


### B.    *Signaling messages*

Dependent claim 15 recites that "the transmission [of claim 1]
comprises *signaling messages*" (emphasis added).  Unlike the term "internet
protocol," the term "signaling messages" does not appear in the
Specification.  Petitioner's declarant, Dr. Jones, proposes a construction of
the term "signaling messages" based on the use of "signaling" in an extrinsic
source (Ex. 1014, p. 58) and the separate definitions of the words
"messages" (Ex. 1018, p. 643) and "signaling" (Ex. 1014, p. 58; Ex. 1018,
p. 933) in a contemporary dictionary of telecommunications terms.  Ex. 1002
¶¶ 48-49.  Petitioner argues that the term "signaling messages" means
"control information exchanged between two points in a network to
establish, maintain, and remove a connection," but Petitioner's construction
does not distinguish between information controlling the establishment of
the call and the speech content of the call.  *See* Pet. 8 (citing Ex. 1002 ¶¶ 48-
50).

Patent Owner contends that Petitioner's proposed construction of this
term is overly broad because it fails to take into account the context in which

15

Case IPR2013-00296
Patent 7,724,879 B2

the term is used in claim 15 and its relation to the term "transmission" in

independent claim 1.  Prelim. Resp. 12-13.  In particular, Patent Owner

objects that Petitioner's construction "fails to limit the scope of a 'signaling

message' to phone call connections." *Id.* at 13.  Instead, Patent Owner

contends that the broadest reasonable interpretation of the term "signaling

message" is "control information exchanged between two points in a

network to establish, maintain and remove a phone call *as distinguished

from conversation information exchanged between a caller and a call

recipient over an already established phone call*." *Id.* at 15 (emphasis

added).

 Patent Owner contends that the "transmission" of claim 1 comprises

"signaling messages" and that, because the "transmission" is in a "first

format comprising a telecommunication protocol for establishing and

transmitting voice communication for a phone call," the "signaling

messages" are related specifically to control of a phone call *connection*.  *Id.*

at 13.  Consequently, Patent Owner contends that this construction is

consistent with the Specification, which provides that "control information

in the form of an inquiry of the availability status of the party to be called

may be sent through different networks by routing it through a control

location of the inventive system that converts it into compatible form." *Id.*

(quoting Ex. 1001, col. 2, ll. 4-12).

 Although both Petitioner and Patent Owner agree that the term

"signaling messages" is construed properly to include "control information

16

Case IPR2013-00296
Patent 7,724,879 B2

exchanged between two points in a network to establish, maintain and remove" a phone call or a telephone connection (Pet. 8; Prelim. Resp. 13), Patent Owner attempts to distinguish these signals *in time* from speech or conversation information exchanged between the calling party and the called party. We discern no such distinction in the language of claim 1 or 15 or in the Specification. Claim 15 further limits the "transmission" of claim 1 to comprise "signaling messages," but claim 1 recites that the "transmission" is transmitted in a first format (e.g., telecommunications protocol) and that the transmission then is converted to a second format (e.g., internet protocol). Therefore, for purposes of this decision, we construe the term "signaling messages" to mean control information exchanged between two points in a network to establish, maintain, and remove a telephone connection.

C.    *Additional construed terms*

Petitioner proposes constructions of the terms "access device," "telecommunication protocol," "telecommunication node," "selecting a route for the transmission based on at least one criteria defined by user preference," and "selecting a route for the transmission based on credit availability of a calling party." Pet. 6-7. Specifically, Petitioner argues that these terms "are to be given their broadest reasonable interpretation, as understood by one of ordinary skill in the art and consistent with the disclosure. 37 C.F.R. § 42.100(b)." *Id.* at 6. We determine that Petitioner's proposed constructions of these terms are consistent with their ordinary and customary meanings (*see* Ex. 1002 ¶¶ 35-38 and 42-47) and are not

17

Case IPR2013-00296
Patent 7,724,879 B2

inconsistent with the use of these terms in the Specification. Thus, we are
persuaded by Petitioner's proposed construction of these terms, as follows:

| Claim Term | Petitioner's Construction |
|---|---|
| *access device* | any device that allows entry to a circuit or other communications facility such as a voice or data network |
| *telecommunication protocol* | a specific set of rules, procedures or conventions relating to format and timing of a communication |
| *telecommunication node* | a point of connection in a telecommunication network |
| *selecting a route for the transmission based on at least one criteria defined by user preference (Claim 8)* | choosing a transmission route for a communication based on a user's criteria |
| *wherein the at least one criteria [of claim 8] comprises credit availability of a calling party (Claim 10)* | choosing whether to transmit or disconnect a call based on a credit availability |

Pet. 7-8. Moreover, Patent Owner does not propose alternative constructions
for these terms. *See* Prelim. Resp. 4 ("This section identifies selected ones
of those overly broad definitions. . . . Patent Owner reserves the right to
contest any or all of the claim term proposals set forth in the Petition,
whether or not they are specifically addressed below."). Therefore, for
purposes of this decision, we construe these additional claim terms in the
manner proposed by Petitioner.

18

Case IPR2013-00296
Patent 7,724,879 B2

### III.    DECISION TO INSTITUTE

For the reasons described below, we institute an *inter partes* review on the grounds that each of claims 1-15 is unpatentable over the combination of Kammerl and Iwami, alone or in further combination with Kobayashi, Chau, or Gordon.

### IV.    GROUNDS FOR REVIEW

#### A.    Priority Date for the '879 Patent Claims

The '879 Patent, issued from U.S. Patent Application No. 11/895,460 filed August 24, 2007, is a continuation of a series of three applications, the last of which is a continuation-in-part of U.S. Patent Application No. 08/320,269 (the "'269 Application"), filed October 11, 1994. Ex. 1001, col. 1, ll. 7-14. Gordon and Iwami have U.S. filing dates of February 13, 1995, and December 13, 1994, respectively. Ex. 1005 (Item [22] on face page); Ex. 1006 (Item [22] on face page). Initially, we note that Petitioner only may request *inter partes* review based on statutory grounds under 35 U.S.C. §§ 102 or 103 based on patents or printed publications. 37 C.F.R. § 42.104(b)(2). Petitioner must identify the references relied upon in support of its challenge to the claims of the '879 Patent. *Id.*

Petitioner argues that the '879 Patent is not entitled to the benefit of the earliest date, October 11, 1994, to which the applicant claimed priority under 35 U.S.C. § 120. Pet. 10-11. In particular, Petitioner notes that Dr. Jones opined that "the '269 application would not have conveyed to a

Case IPR2013-00296
Patent 7,724,879 B2

person of ordinary skill in the art that the applicant was in possession of *the subject matter claimed* in the '879 patent at the time that the '269 application was filed." *Id.* at 10 (emphasis added; citing Ex. 1002 ¶¶ 51-58). Moreover, Petitioner argues that the '269 Application does not mention the term "internet protocol" and that, based on Dr. Jones's review, the '269 Application does not provide support for the use of an "internet protocol." *Id.*

Although Patent Owner notes that the '879 Patent claims an earliest priority date of October 11, 1994, Patent Owner does not rely on this priority date to distinguish the cited references, and, in particular, to distinguish Gordon and Iwami, over the challenged claims. Prelim Resp. 2 n.1. Rather, Patent Owner states that it "reserves the right to present evidence and argument in support of the October 11, 1994, priority claim." *Id.*

We are not persuaded that, because the term "internet protocol" does not appear in the '269 Application, the '269 Application lacks support for that term. *See* Ex. 1002 ¶ 52. Moreover, because we do not adopt Petitioner's construction of the term "internet protocol," Dr. Jones's opinion as to whether a person skilled in the relevant art would have understood the applicant to have been "in possession of any of the claims of the '879 patent when the '269 application was filed" also is not persuasive. *See id.* at ¶ 58.

Nevertheless, Dr. Jones correctly observes that Figures 2-6, 7A-7G, 8, and 9 of the '879 Patent, and their corresponding descriptions in the '879 Patent, are not included in the '269 Application. *Id.* at ¶ 52. Further, Patent

20

Case IPR2013-00296
Patent 7,724,879 B2

Owner indicates that Figure 9 of the '879 Patent provides an overview of the claimed invention. Prelim. Resp. 3. Moreover, figures corresponding to Figures 2-6, 7A-7G, 8, and 9 of the '879 Patent first appear in U.S. Patent Application No. 08/727,681, now issued as Patent No. US 6,188,756 B1, *filed October 8, 1996*. Ex. 3001. Based on the current record, and in view of Patent Owner's failure to contest Petitioner's challenge to the priority date of the '879 Patent, we determine that Petitioner has demonstrated a reasonable likelihood that the claims of the '879 Patent are not entitled to the October 11, 1994, filing date of the '269 Application. Therefore, for purposes of this decision, we ascribe an effective filing date of October 8, 1996, for each challenged claim. Consequently, Petitioner has demonstrated a reasonable likelihood that Gordon and Iwami are prior art references under 35 U.S.C.

§ 102(e), and we decide whether to institute an *inter partes* review based on consideration of all of the cited references.

### B.     Unpatentability Due To Obviousness

#### 1.     Kammerl and Iwami

Petitioner argues that Kammerl discloses all of the limitations of independent claim 1, except for "the second format being an internet protocol." Pet. 47-52. Petitioner argues, however, that Iwami clearly teaches a second format that is an internet protocol. *Id.* at 49. Petitioner argues that, referring to Iwami's Figure 1, "Iwami discloses using the Internet Protocol for establishing and transmitting voice communications for

21

Case IPR2013-00296
Patent 7,724,879 B2

a phone call.  In particular, Iwami's system allows a telephone connected

through a public telephone network to place a call across a packet-switched

network to a terminal connected through a Local Area Network (LAN)." *Id*.

at 41 (citing Ex. 1006, col. 1, ll. 55-60, col. 11, ll. 19-25, col. 12, ll. 52-59).

> As Iwami further explains:

> *the LAN communication controller 14 shown in FIG. 2 may be*
> *adapted to simultaneously support a plurality of communication*
> *protocols, for example, TCP/IP protocol and UDP/IP protocol*,
> such that the voice communication packet is transmitted
> utilizing the UDP/IP protocol . . . and *control information such*
> *as the voice communication request command and voice*
> *communication end notice command* shown in FIG. 5 *and the*
> *connected terminal determination result notice command*
> shown in FIG. 19 *are transmitted utilizing the TCP/IP protocol.*
> The appropriate use of different protocols in this way will . . .
> reliably control the start, termination, and so on of the voice
> communication.

Ex. 1006, col. 17, ll. 44-58 (emphases added).  Petitioner argues that a

person of ordinary skill in the relevant art:

> would have understood that Internet Protocol as taught by
> Iwami could be used over the ATM network taught by
> Kammerl.  Doing so would have allowed Kammerl's voice
> communications to be transmitted on networks other than ATM
> networks.  This is the reason that internetworking or internet
> protocols such as the Internet Protocol were developed—to
> allow internetworking of diverse networks.

Pet. 49-50 (citing Ex. 1002 ¶ 227) (citations omitted).

22

Case IPR2013-00296
Patent 7,724,879 B2

Finally, referring to Figure 2, reproduced below, Kammerl depicts a second example of a broadband communications network, such that a number of network transfers are provided in different transmission directions.  Ex. 1013, col. 5, ll. 33-36.

## FIG 2



As depicted in Figure 2 above, three interworking units (NUE1, NUE2, and NUE3) are connected to a packet switching network PN and to a telephone switching network AN.  *Id.* at ll. 36-39.  Each of the three interworking units is connected to one of three different telephone exchanges (AVST1, AVST2, and AVST3) by way of a trunk group for each.  *Id.* at ll. 39-42.  Moreover, Kammerl teaches that the broadband communications network depicted in Figure 2 may be modified, such that

23

Case IPR2013-00296
Patent 7,724,879 B2

packet switching network PN is connected as a transit network by way of interworking units between two telephone switching networks.  *Id.* at ll. 57-61.  Thus, Petitioner argues that Kammerl teaches the "sending" and "performing" steps of independent claim 1.  Pet. 50-52.

Patent Owner objects to Petitioner's proposed combination of Kammerl and Iwami for two reasons.  First, Patent Owner contends that Kammerl and Iwami fail to teach or suggest all of the limitations of claim 1.  Prelim. Resp. 52-54.  Initially, Patent Owner contends that Iwami does not teach or suggest "performing a second conversion further converting the converted transmission from the second format to a further format suitable for the second access device," as recited in claim 1.  *Id.* at 53.  Instead, Patent Owner contends that, at most, Iwami's communication server performs "a conversion from a first to a second format, but does not perform a second conversion to a further format."  *Id.* (citing Ex. 1006, col. 3, ll. 4-10).  We note, however, that Petitioner relies on Kammerl, *not* Iwami, as teaching the step of "performing a second conversion further converting the converted transmission from the second format to a further format suitable for the second access device."  Pet. 51-52.

Patent Owner further contends that, assuming *arguendo* that Kammerl teaches the second conversion, Kammerl's second conversion would be performed "in the context of an ATM network."  Prelim. Resp. 53.  As noted above, however, Petitioner relies on Iwami, *not* Kammerl, to teach or suggest the "internet protocol" recited in claim 1.  Pet. 49-50.  Thus, we are

24

Case IPR2013-00296
Patent 7,724,879 B2

not persuaded that Kammerl and Iwami fail to teach all of the limitations of challenged claim 1.

Second, Patent Owner contends that a person of ordinary skill in the relevant art would not have had a reason to combine the teachings of these references in the manner proposed by Petitioner.  Prelim. Resp. 54-57.  In particular, Patent Owner contends that a person of ordinary skill in the relevant art would not have modified the teachings of Kammerl in view of the teachings of Iwami to teach conversion to an internet protocol "because: (i) Kammerl teaches away from such a modification; (ii) the modification renders Kammerl's system inoperable for its intended purpose; and (iii) the Petitioner's stated reason in support of this proposed modification is nonsensical."  *Id.* at 55.

A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the applicant.  *In re Gurley*, 27 F.3d 551, 53 (Fed. Cir. 1994).  "The fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another.  Instead, the benefits, both lost and gained, should be weighed against one another." *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000); *see DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d

25

Case IPR2013-00296
Patent 7,724,879 B2

1314, 1327 (Fed. Cir. 2009) ("A reference does not teach away . . . if it merely expresses a general preference for an alternative invention.").

Kammerl states that "[t]he problem which the present invention overcomes is [to] reduce the lag times due to the packet switching network in transmission of speech signals at least partially in a packet switching network." Ex. 1013, col. 1, ll. 57-60. Patent Owner contends that modifying Kammerl's system to include using Iwami's TCP/IP protocol would increase, not reduce, lag times. Prelim. Resp. 55. Patent Owner, however, does not provide sufficient and credible evidence that packet-switching networks, such as those employing TCP/IP, must incur increased lag times when compared to ATM networks. *See id.* Further, we note that Kammerl describes using an ATM network with respect to a preferred embodiment of the invention. Ex. 1013, col. 3, ll. 35-41. Kammerl's independent claims, however, are not limited to ATM networks, and we conclude that Kammerl's disclosure is broader than the general preference expressed in the preferred embodiment. Thus, based on the current record, we are not persuaded that Kammerl teaches away from its combination with Iwami.

Similarly, Patent Owner does not provide sufficient and credible evidence that the modification of Kammerl to include the use of an internet protocol, rather than ATM, would render Kammerl's invention unsuitable for its intended purpose. Regarding the use of TPC/IP protocols, Iwami states that "[t]he appropriate use of different protocols in this way will

26

Case IPR2013-00296
Patent 7,724,879 B2

*prevent a delay in the arrival of the voice communication packets* and reliably control the start, termination, and so on of the voice communication." Ex. 1006, col. 17, ll. 55-58.

Finally, Patent Owner contends that Petitioner's stated reason for combining the teachings of Kammerl and Iwami is "nonsensical." Prelim. Resp. 56. As noted above, Petitioner argues that a person of ordinary skill in the relevant art:

> would have understood *that Internet Protocol as taught by Iwami could be used over the ATM network taught by Kammerl.* . . . Doing so would have allowed Kammerl's voice communications *to be transmitted on networks other than ATM networks*. . . . This is the reason that internetworking or internet protocols such as the Internet Protocol were developed to allow internetworking of diverse networks.

Pet. 49 (emphases added). Patent Owner contends that "sending the voice signals as IP packets over the ATM network does not perform any type of internetworking function, as the IP packets are merely transported intact across the ATM link and extracted on the other side." Prelim. Resp. 56-57. Based on the current record, however, we see no reason why Internet Protocol packets, as taught by Iwami, could not be transmitted over the ATM network taught by Kammerl, and we are persuaded by the analysis set forth by Petitioner and Dr. Jones. *See* Pet. 49 (citing Ex. 1002, ¶ 227). Thus, we are not persuaded that Petitioner's reason for combining Kammerl and Iwami is "nonsensical."

27

Case IPR2013-00296
Patent 7,724,879 B2

In view of the foregoing discussion, we are persuaded that Petitioner demonstrates a reasonable likelihood of prevailing on its challenge to the patentability of independent claim 1. We also are persuaded that Petitioner demonstrates a reasonable likelihood of prevailing on its challenge to the patentability of claims 2-7 and 15 of the '879 Patent as unpatentable over Kammerl and Iwami. Pet. 52-55. Patent Owner in its preliminary response does not argue these claims separately, but instead relies upon its arguments regarding the base claim, claim 1, to distinguish over the combined references.

### 2. *Kammerl, Iwami, and Kobayashi*

Petitioner argues that Kammerl, Iwami, and Kobayashi teach all of the limitations of dependent claims 8, 9, and 11-13. Pet. 56-58. In particular, claim 8 recites that the method of claim 1 "further compris[es] the step of selecting a route for the transmission based on at least one criteria defined by user preference." Each of claims 9 and 11 depends directly from claim 8 and recites that the at least one criteria comprises "a specified level of transmission quality" and the "cost of routing," respectively.

With respect to claims 8, 9, and 11, Petitioner argues that Kammerl is directed to providing voice-over-packet networks in order to improve the "quality of speech signal transmissions." Pet. 56 (quoting Ex. 1013, col. 1, ll. 34-35). Further, Petitioner argues that "Kobayashi teaches a method of improving transmission *quality by routing* on the basis of the recorded preferences of users of the network." *Id.* (emphasis added; citing Ex. 1007,

28

Case IPR2013-00296
Patent 7,724,879 B2

col. 3, ll. 20-25 ("conditions dependent on the respective tenants")).  Thus,
Petitioner concludes that Kammerl, Iwami, and Kobayashi teach all of the
limitations of each of claims 8, 9, and 11.

Claim 12 recites that, in the method of claim 8, "the transmission
comprises execution of a call setup procedure."  Petitioner argues that
Kammerl teaches executing a call setup procedure "that involve[s] inserting
signaling procedure signals from subscriber's sets into packets and relaying
them between the subscriber's sets."  Pet. 57-58 (citing Ex. 1013, col. 3,
ll. 41-55).  Thus, Petitioner argues that Kammerl, Iwami, and Kobayashi
teach all of the limitations of each of claims 8 and 12.

Claim 13 recites that the method of claim 1 "further compris[es] the
step of storing at least one of subscriber information, rate schedules, and call
details."  Petitioner argues that Kobayashi teaches that "the controller CONT
determines the optimal route (least-cost route) by referring to a table stored
in the memory MEM."  Pet. 58 (quoting Ex. 1007, col. 2, ll. 24-26).
Petitioner further argues that a person of ordinary skill in the relevant art
would have had reason to combine the teachings of Kobayashi with those of
Kammerl and Iwami, so that users may be billed for their communication
usage, based on predictable methodologies, such as those relying on stored
subscriber information.  *Id.*  Thus, Petitioner argues that Kammerl, Iwami,
and Kobayashi teach all of the limitations of claim 13.

Patent Owner does not dispute Petitioner's mapping of the disclosure
of Kobayashi or Kammerl on the limitations of claims 8, 9, 11, and 12, or

29

Case IPR2013-00296
Patent 7,724,879 B2

Petitioner's mapping of the disclosure of Kobayashi on the limitations of claim 13. Instead, Patent Owner contends that Petitioner fails to demonstrate (1) that Kammerl and Iwami teach all of the limitations of independent claim 1 and (2) that a person of ordinary skill in the art would have had reason to combine the teachings of Kammerl and Iwami to achieve the invention recited in claim 1. Prelim. Resp. 52-57. We are not persuaded by Patent Owner's contentions, for the reasons set forth above. Petitioner demonstrates a reasonable likelihood of prevailing on its challenge to the patentability of claims 8, 9, and 11-13 of the '879 Patent as unpatentable over Kammerl, Iwami, and Kobayashi.

3.    *Kammerl, Iwami, Kobayashi, and Chau*

Petitioner argues that Kammerl, Iwami, Kobayashi, and Chau teach all of the limitations of dependent claim 10. Pet. 58. Claim 10 depends directly from claim 8 and recites that the at least one criteria comprises "credit availability of a calling party." In particular, Petitioner argues that Chau teaches performing a credit check on callers. *Id.* Specifically, Chau teaches that "[t]he sponsor collects the caller response and may do a credit check on a caller using the provided information. If the credit check indicates that the call should not be accepted, then a suitable message is outputted to the caller and the call is terminated." Ex. 1008, col. 7, ll. 54-59. Moreover, Petitioner argues that modifying the teachings of Kammerl, Iwami, and Kobayashi to conduct a credit check on the caller *as at least one criteria*, as taught by Chau, would involve no more than applying known techniques to achieve a

30

Case IPR2013-00296
Patent 7,724,879 B2

predictable result.  Pet. 58; *see KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398,

416 (2007) ("The Court recognized that when a patent claims a structure

already known in the prior art that is altered by the mere substitution of one

element for another known in the field, the combination must do more than

yield a predictable result.").

Patent Owner does not dispute Petitioner's mapping of the disclosure

of Chau on the limitations of claim 10.  Instead, Patent Owner contends that

Petitioner fails to demonstrate (1) that Kammerl and Iwami teach all of the

limitations of independent claim 1 and (2) that a person of ordinary skill in

the art would have had reason to combine the teachings of Kammerl and

Iwami to achieve the invention recited in claim 1.  Prelim. Resp. 52-57.  As

noted above, we are not persuaded by Patent Owner's contentions.

Consequently, we are persuaded that Petitioner demonstrates a reasonable

likelihood of prevailing on its challenge to the patentability of claim 10 of

the '879 Patent as unpatentable over Kammerl, Iwami, Kobayashi, and

Chau.

### 4.    *Kammerl, Iwami, and Gordon*

Petitioner argues that Kammerl, Iwami, and Gordon teach all of the

limitations of dependent claim 14.  Pet. 58-59.  Claim 14 depends directly

from independent claim 1 and recites that, in the method of claim 1, "the

transmission is related to a fax transmission."  Petitioner argues that

"Gordon teaches sending a fax transmission over a data network."  *Id.*  In

particular, Gordon teaches that "a facsimile transmission addressed to a

31

Case IPR2013-00296
Patent 7,724,879 B2

particular address in Japan can effectively use the UniPost access system."
Ex. 1005, col. 8, ll. 1-3; *see also* Ex. 1005, col. 8, 11-18 (using "the Internet
data transmission system 4 to transfer the facsimile to the Tokyo UniPost
Access Node 6"). Petitioner argues that modifying the teachings of
Kammerl and Iwami to send a facsimile transmission as taught by Gordon,
instead of a voice transmission, would involve no more than applying known
techniques to achieve a predictable result. Pet. 59; *see KSR*, 550 U.S. at 416.

Patent Owner does not dispute Petitioner's mapping of the disclosure
of Gordon on the limitations of claim 14. Instead, Patent Owner contends
that Petitioner fails to demonstrate (1) that Kammerl and Iwami teach all of
the limitations of independent claim 1 and (2) that a person of ordinary skill
in the art would have had reason to combine the teachings of Kammerl and
Iwami to achieve the invention recited in claim 1. Prelim. Resp. 52-57. As
noted above, we are not persuaded by Patent Owner's contentions.
Consequently, we are persuaded that Petitioner demonstrates a reasonable
likelihood of prevailing on its challenge to the patentability of claim 14 of
the '879 Patent as unpatentable over Kammerl, Iwami, and Gordon.

### C. *Remaining Asserted Grounds of Unpatentability*

Petitioner asserts additional grounds of unpatentability with respect to
claims 1-15, as listed in Section I.E above. Those additional grounds are
denied as redundant in light of the determination that there is a reasonable
likelihood that the challenged claims are unpatentable based on the grounds

32

Case IPR2013-00296
Patent 7,724,879 B2

of unpatentability, discussed above, on which we institute an *inter partes* review. *See* 37 C.F.R. § 42.108(a).

## V.    CONCLUSION

For the foregoing reasons, we determine that Petitioner demonstrates a reasonable likelihood of prevailing on its challenge to the patentability of claims 1-15 of the '879 Patent.

## VI.  ORDER

For the reasons given, it is

ORDERED that the petition is *granted* as to claims 1-15 of the '879 Patent and that, pursuant to 35 U.S.C. § 314, an *inter partes* review of the '879 Patent is hereby instituted for the following grounds:

> Claims 1-7 and 15 under 35 U.S.C. § 103(a) as unpatentable over Kammerl and Iwami;

> Claims 8, 9, and 11-13 under 35 U.S.C. § 103(a) as unpatentable over Kammerl, Iwami, and Kobayashi;

> Claim 10 under 35 U.S.C. § 103(a) as unpatentable over Kammerl, Iwami, Kobayashi, and Chau; and

> Claim 14 under 35 U.S.C. § 103(a) as unpatentable over Kammerl, Iwami, and Gordon.

FURTHER ORDERED that the petition for *inter partes* review based on each of the other asserted grounds is *denied*.

33

Case IPR2013-00296
Patent 7,724,879 B2

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), an *inter partes* review of the '879 Patent is hereby instituted commencing on the entry date of this Order, and, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial.

FURTHER ORDERED that an initial conference call with the Board is scheduled for 2:00 PM EST on December 2, 2013. The parties are directed to the *Office Trial Practice Guide*, 77 Fed. Reg. at 48765-66, for guidance in preparing for the initial conference call, and should come prepared to discuss any proposed changes to the Scheduling Order entered herewith and any motions the parties anticipate filing during the trial.

PETITIONER:

Michael B. Ray
Jon E. Wright
Sterne, Kessler, Goldstein & Fox, P.L.L.C.
mray-ptab@skgf.com
jwright-ptab@skgf.com

PATENT OWNER:

John C. Phillips
W. Karl Renner
Roberto J. Devoto
Fish & Richardson P.C.
Phillips@fr.com;
axf@fr.com;
Devoto@fr.com
IPR38460-0002IP1@fr.com

34

US007724879B2

(12) **United States Patent**
Mashinsky

(10) **Patent No.:**     **US 7,724,879 B2**
(45) **Date of Patent:**     *May 25, 2010

(54) **EFFICIENT COMMUNICATION THROUGH NETWORKS**

(75) Inventor: **Alexander Mashinsky**, New York, NY (US)

(73) Assignee: **Anip, Inc.**, Carson City, NV (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/895,460**

(22) Filed: **Aug. 24, 2007**

(65) **Prior Publication Data**

US 2008/0226054 A1     Sep. 18, 2008

**Related U.S. Application Data**

(63) Continuation of application No. 10/941,471, filed on Sep. 15, 2004, now Pat. No. 7,269,247, which is a continuation of application No. 09/551,189, filed on Apr. 17, 2000, now abandoned, which is a continuation of application No. 08/727,681, filed on Oct. 8, 1996, now Pat. No. 6,188,756, which is a continuation-in-part of application No. 08/320,269, filed on Oct. 11, 1994, now abandoned.

(30) **Foreign Application Priority Data**

Oct. 11, 1995     (IL)     ..................................... 115580

(51) **Int. Cl.**
*H04M 11/06*     (2006.01)

(52) **U.S. Cl.** .................. 379/88.14; 340/7.21; 370/354; 379/142.04; 705/65

(58) **Field of Classification Search** ................. 370/354, 370/329, 335, 407, 506, 524; 340/7.21; 379/88.14, 379/88.01, 88.13, 142.04; 348/14.1; 358/440; 375/377; 455/430; 703/27; 710/105; 705/65
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,644,351 A | * | 2/1987 | Zabarsky et al. ........... 340/7.21 |
| 5,027,387 A | | 6/1991 | Moll |
| 5,042,027 A | | 8/1991 | Takase et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

JP          07 131486          5/1995

OTHER PUBLICATIONS

C. Yang, RFC 1789—INETPhone: Telephone Services and Servers on Internet, University of North Texas, Apr. 1995, pp. 1-6.

*Primary Examiner*—Gerald Gauthier
(74) *Attorney, Agent, or Firm*—Cohen Pontani Lieberman & Pavane LLP

(57)     **ABSTRACT**

A method and device that interrogates the availability of a called party before placing a communication from the calling party to the called party. A callback may be initiated so that both communications are completed simultaneously. The routing of communication may take place through any one of a number of different networks and at another time of the day, even if the caller does not otherwise have access to those networks.

**15 Claims, 8 Drawing Sheets**



Exhibit 1001
IPR of U.S. Patent No. 7,724,879

Add. 58

**US 7,724,879 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,287,202 A | * | 2/1994 | Kumarappan ............... 358/440 |
| 5,406,557 A | * | 4/1995 | Baudoin ...................... 370/407 |
| 5,412,760 A | * | 5/1995 | Peitz .......................... 370/329 |
| 5,426,643 A | * | 6/1995 | Smolinske et al. .......... 370/506 |
| 5,434,854 A | * | 7/1995 | Focarile et al. ............ 370/335 |
| 5,444,713 A | * | 8/1995 | Backaus et al. ............. 370/524 |
| 5,502,752 A | * | 3/1996 | Averbuch et al. ........... 375/377 |
| 5,511,111 A | * | 4/1996 | Serbetcioglu et al. .... 379/88.01 |
| 5,526,404 A | * | 6/1996 | Wiedeman et al. .......... 455/430 |
| 5,534,914 A | * | 7/1996 | Flohr et al. ................ 348/14.1 |
| 5,553,271 A | * | 9/1996 | Hile et al. ..................... 703/27 |
| 5,617,423 A | | 4/1997 | Li et al. |
| 5,699,089 A | | 12/1997 | Murray |
| 5,724,406 A | * | 3/1998 | Juster ...................... 379/88.13 |
| 5,726,984 A | | 3/1998 | Kubler et al. |
| 5,742,905 A | | 4/1998 | Pepe et al. |
| 5,859,984 A | * | 1/1999 | Blair et al. .................. 710/105 |
| 5,999,598 A | | 12/1999 | Henrick et al. |
| 6,104,711 A | | 8/2000 | Voit |
| 6,108,704 A | | 8/2000 | Hutton et al. |
| 6,128,304 A | | 10/2000 | Gardell et al. |
| 6,137,869 A | | 10/2000 | Voit et al. |
| 6,243,373 B1 | | 6/2001 | Turock |
| 6,282,574 B1 | | 8/2001 | Voit |
| 6,298,062 B1 | | 10/2001 | Gardell et al. |
| 6,359,880 B1 | | 3/2002 | Curry et al. |
| 6,430,275 B1 | | 8/2002 | Voit et al. |
| 7,269,247 B2 | * | 9/2007 | Mashinsky ............... 379/88.14 |
| 7,454,000 B1 | * | 11/2008 | Henderson ............. 379/142.04 |
| 2006/0190412 A1 | * | 8/2006 | Ostroff ........................ 705/65 |

* cited by examiner





FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG.7A

FIG. 7B

FIG. 7C

FIG. 7D

FIG. 7E

FIG. 7F

FIG. 7G



FIG. 8



FIG. 9

US 7,724,879 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

## EFFICIENT COMMUNICATION THROUGH NETWORKS

### CROSS REFERENCE TO RELATED APPLICATIONS

This is a continuation of U.S. patent application Ser. No. 10/941,471, filed Sep. 15, 2004 now U.S. Pat. No. 7,269,247, which is a continuation of U.S. patent application Ser. No. 09/551,189, filed Apr. 17, 2000 now abandoned, which is a continuation of U.S. patent application Ser. No. 08/727,681, filed Oct. 8, 1996, issued as U.S. Pat. No. 6,188,756, which is a continuation-in-part of U.S. patent application Ser. No. 08/320,269, filed Oct. 11, 1994, now abandoned.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a system for providing transparent access to different types of communication networks that may be incompatible with each other and some of which may be incompatible; with the equipment used by the calling party or the called party, least cost routing in such a system, maintaining quality of communication in such a system, prioritizing the routing of such communications, evaluating different communication access locations to determine where to send a communication, synchronizing communications, blocking incoming communications while waiting for the synchronizing to be completed, and minimizing the cost of communications using such a system. This system also monitors and records the services used on each of the unrelated service providers. This information is then utilized for billing purposes and for paying the service providers.

2. Description of the Related Art

Presently when communication services are offered on a global basis, communications are established through the equipment of a plurality of service providers located in various countries. This communication is dominated by large carriers which have formed the global network through reciprocal agreements. Smaller competing carriers, who may offer the same service at lower prices, currently do not have reciprocal agreements between them.

The invention provides these smaller competing carriers with access to each other without the use of the large carriers. Such access provides the calling party (e.g., a subscriber of the smaller competing carrier) with the option of obtaining optimum service at lower prices while ensuring that the appropriate service providers get paid. The calling party can now have cheaper access to different types of telecommunication networks that the party may not have access to under the current large carrier system. It may be cheaper or preferred for the calling party to use smaller carriers to communicate with another location by routing the communication over a digital data network rather than an analog voice network, or by routing the communication over a paging network rather than a cellular network or a combination of networks.

### SUMMARY OF THE INVENTION

One objective of the invention is to provide communication between otherwise incompatible communication networks in a manner that is transparent to the calling party (that is, the subscriber of the service initiating the communication), while assuring that each service provider that renders service in routing that communication gets paid. Preferably, the communication is routed based on the results from an evaluation of all available communication networks even though the calling party may have direct access to only one type of communication network.

In accordance with the invention, control information in the form of an inquiry of the availability status of the party to be called may be sent through different networks by routing it through a control location of the inventive system that converts it into a compatible form. For instance, the called party may be using one type of network, such as a data network having E-mail, while the calling party is using another, such as a cellular network

With a conventional data network, sending an E-mail message to an address on the data network does not indicate the availability of a party on a cellular network to communicate. In accordance with one embodiment of the invention, however, the control location of the inventive system is connected with both the data network and the cellular network to convert the control information associated with E-mail into a form compatible on the cellular network for making an inquiry and then transmits the inquiry over the cellular network.

The inventive system may have external or internal software and hardware that intercepts the normal transmission to route it appropriately. The system effects further routing, which may include converting between different forms of communication networks, compressing voice into data packets or decompressing data packets into voice, coding and decoding transmissions for security reasons, and multiplexing communications over the same lines. The system records the various routing transactions involved in the communication and calculates the billing of the transactions in a manner that is transparent to the calling party.

Another objective of the invention is to interrogate the called party number's communication availability prior to conferencing the calling party and called party. The inventive system may have a control location that receives both a calling party and a called party access number or identification. After receiving these access numbers, the system initiates an inquiry to the called party from the control location and waits for a status signal as to the called party location's availability to take incoming calls. If the status signal indicates an available status, a first communication is initiated to the called party access number from the control location and a second communication is initiated to the calling party access number from the control location. Thereafter, the first and second communications are bridged using the same or different networks.

In addition to interrogating the called party's availability status, the control location determines where to route the call by examining factors such as transmission cost, the appropriate network for the desired transmission, the service provider that provides this kind of network and the plurality of available called party locations that service the called party access number. The control location also considers communication networks that are available to the called party locations and the identity of service providers who provide those communication networks across the various called party locations. After receiving the calling party and called party access numbers, the control location performs an inquiry as to which service provider and which network can route the transmission.

In addition to technological considerations, the control location also studies the various cost to perform the desired transmission and records such information for both monitoring and billing purposes. An authorizer uses such information to monitor all incoming and outgoing transactions between

US 7,724,879 B2

3

the network service providers and provide clearance insuring payment and settlement of all transaction for each of these operators.

In routing communications, the control location takes into consideration customer defined preference criteria relating to preferences for particular types of communication network, transmission quality, cost, security, and priority of transmission. For example, if the quality of a transmission is not acceptable, the transmissions may be rerouted to any other available network that can transmit with better quality, thereby ensuring that the quality of the transmission satisfies the customer's preference criteria for transmission quality. The calling party access number itself may include a message or protocol containing preference criteria selections.

Another objective of the invention involves synchronizing the completion of callback from the control location to the calling party and called party legs of communication. The synchronization involves the calculation of the waiting time that is necessary before the control location commences each callback. The waiting time may be fixed or read from memory off a data base located at the control location. This synchronization may result in completion of both communications simultaneously or with minimal delay, i.e., a significantly shorter delay than without the synchronization. Such synchronization results in more efficient use of the network at a lower cost.

While the control location is waiting to initiate completion of one of the callback legs of communication, an incoming communication may block the completion of that one leg and thereby interrupt the synchronization from taking place. The blocking period may be for a fixed time period or may be based on information in a data base that includes information relating to the expected waiting time for completing communications.

In accordance with all embodiments of the invention, the communication being established may be two-way.

Other objects and features of the present invention will become apparent from the following detailed description considered in conjunction with the accompanying drawings. It is to be understood, however, that the drawings are designed solely for purposes of illustration and not as a definition of the limits of the invention, for which reference should be made to the appended claims. It should be further understood that the drawings are not necessarily drawn to scale and that, unless otherwise indicated, they are merely intended to conceptually illustrate the structures and procedures described herein.

BRIEF DESCRIPTION OF THE DRAWINGS

For a better understanding of the present invention, reference is made to the following description and accompanying drawing, while the scope of the invention is set forth in the appended claims.

FIG. 1 is a conceptual block diagram indicating the principles of operation of the inventive method to interrogate over a data network and transmit voice over the data network.

FIG. 2 is a schematic diagram of a system overview having two servers at nodes connected to an Internet backbone.

FIG. 3 is a schematic diagram of a telephony server.

FIG. 4 is a functional block diagram of the embodiment of FIG. 2.

FIG. 5 is a schematic diagram of a flow chart showing routing for versatility and priority of transmission.

FIG. 6 is a schematic diagram of a flow chart showing synchronizing connection.

FIGS. 7A-7G are schematic diagrams showing different types of communication routing techniques.

4

FIG. 8 is a schematic representation of a central local node interacting with networks in accordance with the invention.

FIG. 9 is a conceptual block diagram that is a further variation of that of FIG. 1.

DETAILED DESCRIPTION OF THE PRESENTLY PREFERRED EMBODIMENTS

Turning to FIG. 1, a schematic drawing depicting a method of sending a voice or digital transmission to a local node is shown. For ease in understanding, this drawing is the same as FIG. 1 of the copending U.S. patent application Ser. No. 08/320,269 (the '269 application), filed Oct. 11, 1994 by the present inventor and entitled METHOD OF AND SYSTEM FOR EFFICIENT USE OF TELECOMMUNICATION NETWORKS (as amended), whose contents are incorporated herein by reference.

The '269 application describes a technique by which hotels, and other similarly situated establishments, can make use of international callback technology. The reference numbers in FIG. 1 of the '269 application are the same as those in FIG. 1 of the present application, i.e., a telecommunications network 10, calling location 12, called location 14, transparent telecommunications node or intercept 16, first central local node 18, data network 20, central office 22, second central local node 24, phonecall 26, link 28 to central local node 18, link 30 to the external channel 20, link 32 to the second central local node 24, line 36 over which a first phonecall 27 is made to interrogate the called location 14 and over which is sent back a call supervision status signal 38, a callback 40, an uncompleted call signal 42, a message 44, a reverse answer supervision signal 47 and a calling location 48 that places a call 50A or receives a callback 52A.

The calling location 12 may be where a data transmission originates or where a voice communication originates for eventual receipt by the calling location 14. While phonecalls are certainly one form of communication envisioned, the invention covers any type of communication, whether it involves public service telephone networks, cellular networks, paging networks, data networks, analog networks, etc. A call is to be interpreted as any form of communication over a network and not limited just to voice phonecalls.

While such a technique is particularly suited to callback situations that employ a voice network, it is also applicable to employing digital data based networks such as the internet computer network For instance, instead of routing a call direct between locations A and B using technology X, it may be cheaper to use callbacks from location C to location A and from location C to location B using technology Y.

As used in this application, the term "calling party" designates the initiator of the transmission or communication, which may include callers over phone networks, subscribers that use data, cellular or paging networks, etc. The term "called party" designates the ultimate receiver of the transmission or communication from the calling party and with whom communication is being effected. The called party may include users of phone networks, cellular networks, paging networks, data networks, etc. whose access device on the network serve as the destination to which the transmission or communication is directed from the calling party.

In addition to transmitting voice through the telecommunication network 10, the voice may be converted into digital form in a conventional manner, e.g., compressed into data packets or sampled. At the first central local node 18, the call from the calling location 12 is converted to a data signal which is then sent over a data network such as the data network 20 to the called location or destination 14. Prior to

**5**

reaching the called party, the data signal is reconverted into voice at the central office **22** (or control location) to be transmitted to the destination **14** via a public communications network or other connection line **36**. Such a transaction bypasses the use of the international telephone networks and utilizes local calls instead. All internode connections are via the data network.

In addition, by transmitting voice over a data network, the need for callback over a telephone network to save costs is obviated. Since data transmissions are virtually instantaneous, the costs associated with the waiting times for transmitting voice over conventional phone networks is avoided and even the costs associated with waiting times for making connection in a callback over a conventional phone network are avoided.

Each node is capable of communicating with other nodes for purposes of routing the communication and act as a transit node, making inquiries to determine availability of the party at the destination to receive the communication, and even tracking down which network the party is presently accessing so that the communication may be routed there. For instance, a node at the called party may be preprogrammed with all different forms of communication networks and contact identifications that the party may be accessing, together with their addresses, access numbers, or other types of identification information to access them from the node.

Upon receipt of a request inquiring as to the availability of the party to receive a communication, the node at the called party having the main identification or number associated with the called party checks the status of each of these communication networks at different access locations to determine whether any are being accessed by the party at that time. In this connection, the called party would have previously designated the main identifications (addresses, etc.) or phone numbers where it wants to be reached and what networks are to be employed.

For instance, the check may reveal that the called party's computer is logged in or that the phone is hooked up, etc. If so, then the node has identified where the party may be accessed and then contacts the inquiring node to forward an authorization code for billing credit purposes so that the called party node may effect communication through this identified communication network. The authorization code limits the duration and services that may be provided. Alternatively, the system may send the authorization code together with the inquiry.

The node that made the inquiry request sends the authorization code after checking in with a central node responsible for clearing all transactions and which registers every event on the network. The central node may be part of a distributed network of central nodes that are responsible for billing. After the called party node receives the authorization code and authenticates it for billing purposes, communication may be established to the party through the identified communication network that was tracked down and found to be accessible all transparent to the end user. An appropriate signal is transmitted to the requesting node that communication may commence between the parties.

An example of tracking down the called party will now be described. Assume that the party spends half the year in North America using NACN cellular network and the remainder in Europe using GSM internet network hookup using Laptop computer. Under normal situations, these two forms of networks are not compatible so direct communication is not possible. However, in accordance with the invention, such a situation is rectified by communicating with a node that is programmed with information as to which of the possible

**6**

networks the party may be using. If the node is in contact with the NACN system, it is also in contact with a node that is in contact with the GSM system Both nodes check their respective cellular systems to locate on which the party is or has been accessing or which has been turned off. Once the accessible location is identified, contact can be made from regular telephone to the laptop converting and routing the voice over data to the laptop on which it is converted back into voice.

As an example of operation, the subscriber of the service provider first contacts a central local node by providing the calling party's identity access number or identification and the called party access number or identification, as well as the type of service desired as concerns routing preferences, service providers, level of transmission quality, timing of transmission, etc.

The central local node polls the called party nodes to locate the network which the called party is accessing. For instance, one called party node may be programmed with access information on all the possible networks that the called party may be using, e.g., cellular, computer, paging, etc. This called party node then searches to find where the called party is or is likely to be and then informs the central local node that the communication may be sent to it upon receipt of an authorization number for the transaction.

The central local node provides such authorization, perhaps after checking with the central node first that handles billing and determining that the calling party or service providers satisfy financial conditions for permitting service and future settlement. If the central local nodes do a least cost routing analysis, for instance, and determine that a callback from the called party is the cheaper way to complete the transaction and both the calling party's service provider and called party's service provider has received authorization, then the originating service provider will be billed. The central node records all such transactions for billing purposes.

One application of the invention that allows the Internet or other data network to function like a telephone and fax machine will now be explained. Callers are allowed to dial anywhere in the world for the price of a local access and service fee and avoid using long distance carriers. Users may make such calls to have voice conversations and to send faxes to remote locations. For making voice calls, a local system is dialed via computer access or regular phone which prompts the users for the called party number or identification and then connects them to the called party over the Internet or other data network, such as by connecting them via a node through a local call or through other networks. For example, a calling party may access a node that converts the transmission into data to support the network that it chooses. For instance, it may connect to another node that converts the transmission into voice and then connects the communication into a local call to the called party with the called party node being operated by an independent service provider located elsewhere such as in another country. Of course, the connection takes place only after authorization is received to complete the local call.

For sending faxes, the calling party sends a fax into a central local node and the fax is then forwarded to the called party over the Internet or other data network. The fax may be sent in real time or as a store and a forward mode for later sending as part of a subsequent batch transmission, depending upon the preferences of the calling party.

The present invention envisions the option of using a single communication device, such as a multimedia laptop computer, to initiate and receive all forms of communication by contacting a node or being contacted by a node in accordance with the invention and providing it with an identification

US 7,724,879 B2

7

access address and a called party access address, phone number or other type of identity code and any preferences concerning the transmission, such as level of quality of transmission, service providers, time of cost, transmission (e.g., real time or store and forward later), security, encryption, etc.

Transparent to the calling party that is using the laptop, the node takes care of all further action such as tracking down the called party, handling financial billing and obtaining authorization for completing transactions via individual remote service providers, determining the preferred path to route communications even if over otherwise incompatible networks by converting the transmissions accordingly, checking the level of quality of the transmission and making sure the transmission satisfies preferences.

In addition to having access to a data network, the laptop may have appropriate software/hardware that give it access to a cellular digital packet data and, via a built-in fax modem, to a phone network. Thus, the laptop may be in contact with the node through any of these different communication networks and communicate over any of these communication networks as well, including performing two way voice calls.

Other applications of the invention concern transmissions through conventional switched frame relay, conventional switched asynchronous transfer mode and other conventional data networks such as the Internet. Frame relay is an international standard for efficiently handling high-speed data over wide area networks that uses network bandwidth only when there is traffic to send. Asynchronous transfer mode allows users to combine voice, video and data on a single phone line and operates at up to Gigabyte-per-second speeds in which usable capacity is segmented into fixed-size cells each consisting of header and information fields allocated to services on demand. The Internet network differs from frame relay switching and asynchronous transfer mode by using internet protocols such as transmission control protocol/Internet protocol (TCP/IP), which is a set of protocols developed by the Department of Defense to link dissimilar computers across a variety of other networks and protocols.

Referring to FIG. 2, several remote nodes 50, 52, 54 are shown on the Internet backbone 56. Each remote node has a telephone server 60 and an Internet server 62, although a common server may be used instead to provide both functions. The Internet server 62 has access to the Internet backbone 56. Both servers 60, 62 are networked using transmission control protocol/Internet protocol TCP/IP, which is a set of protocols that link dissimilar computers across a variety of other networks and protocols as conventionally used on local area networks, minicomputers and mainframes, or are networked with a router in the case of an ATM. Subscribers 64 dial into and are serviced by the telephone server 60, which is a computer based machine with conventional voice and fax processing hardware and software, so as to establish a connection with one of the remote nodes. Subscribers access the servers by using any of the conventional off-the-shelf phone and fax machines.

Referring to FIG. 3, a calling party interface 70, operator interface 72 and a public switched telephone network PSTN interface 74 are shown. The subscriber interface 70 provides subscribers or calling parties with internet phone and fax service via the Internet is Server 62 of the remote nodes (see FIG. 2). The calling party may dial into the subscriber interface 70 through voice or data lines, for instance, with a computer or laptop. The PSTN interface 74 has lines that are used for inbound calls and lines that are used for outbound calls. These lines for inbound calls lead to industry standard dialogic hardware or a modem such that when a particular num-

8

ber is called, the identification or password of the calling party is checked for validity of identity.

If determined to be valid, the calling party is requested to indicate what service is desired so that the communication may be routed accordingly over voice or data networks. The called party is contacted to determine availability for receiving the communication. If available, communication is established over the desired service. Otherwise, if real time communication is desired, the calling party is notified that contact is unavailable.

If store and forward is the desired method of communication, then the called party is monitored until contact becomes available, at which time the communication may be transmitted. A store and forward type communication is one in which a desired communication, such as a telecopier transmission, is stored until it may be sent in accordance with other criteria, such as in batch format at off peak rates.

Voice processing entails call processing and content processing. Call processing involves physically moving the call around such as through switching. Content processing involves actually interacting with the call's content, such as digitizing, storing, recognizing, compressing, multiplexing, editing or using it as input to a computer program.

The operator interface 72 includes designated representatives of the service provider to interact with the system by means of a personal computer console to perform essential functions such as subscriber administration, rate schedule management, billing and system administration. These functions are remotely accessible by dial up.

FIG. 4 shows the functional hardware in accordance with the invention. In addition to the previously mentioned fundamental external interfaces, the internal functional blocks that are necessary for the present invention include, as represented by blocks in the diagram, a data base 76, call management 78, switching, voice and fax messaging 80. The horizontal links 82 on either side of the switching and voice messaging block 80 are voice paths. The remaining links 84 are all data flow paths.

The data base 76 is a database management system that is used as a repository for subscriber information, rate schedules, call details, and configuration information required to operate the system and the franchise. Switching via block 80 is required to establish voice or fax between the source and the called party. Pre-recorded audio messages are played back onto a voice pathway by voice messaging for purposes of greeting, indicating normal call setup progress, and checking system load status, subscriber account status, and error calculations. Voice messaging refers to a small set of system wide messages and not to arbitrary voice mail messages.

Calls originating from the PSTN interface side are detected by the switching voice messaging block 80, which also communicates with call management 78 to establish a link with the called party node via the Internet server 62 of FIG. 2 and a voice or data line and to determine which message to playback if any. The call management 78 handles call set up requests from either the subscriber interface 70 side or PSTN interface 74 side to issue call set up commands to the subscriber interface 70 and to the switching voice messaging 80. It maintains status information on the subscriber interface and PSTN lines. The call management 78 is configurable to verify credit availability before setting up a call with other nodes if necessary, and monitor the call to issue voice messaging and call termination commands upon credit depletion. It handles call take down situations by recording call detail information in the database for eventual billing purposes and issuing relevant commands directly to subscriber interface 70.

US 7,724,879 B2

9

For establishing a call, the following steps may take place:

The dialogic hardware answers the call. The switching voice messaging **80** sends a message to the answered call via the voice processing unit requesting entry of a called party access number, which after its entry is received and stored. The call management **78** checks the data base **76** for the user's billing status. If invalid, the voice processing unit plays a message and the call is disconnected. Otherwise, for valid callers, the call management **78** initiates the subscriber interface **70** to send a request packet over the Internet other data or voice line; the request packet consists of the called party number or identification and may include an authorization code.

Upon receipt of the packet at a remote central local node, the remote central local node will dial the called party number or enter its address, perform a call analysis and send the result back to the subscriber interface at the origination node. Call management **78** checks the analysis result. If a connection link was established, then the call begins. Otherwise, the switching voice messaging **80** prompts the user via the voice processing unit with a message and options, such as dial another number or leave a message in a voice mailbox. Upon completion of the call, billing information will be stored in the data base **76** for further processing by the operator interface **72**.

FIG. **5** illustrates a technique for gaining access to a greater number of telecommunication networks. The normal transmission from an access device is intercepted by an intercept device, which routes the transmission to a central local node. At the central local node, an investigation is made as to what route is available for the specific service.

After determining which route is available, the central local node determines all available nodes that can provide such a service for the called party end. The central local node then selects a specific available node based on considerations such as cost, line quality and security and priority. The central local node checks with an internal data base to determine the available networks at the called party end, the identity of the service providers who provide those networks across different nodes, and the different transmission costs associated with customer defined criteria. The network access devices supported at the called party end could be a telecopier, telex, voice telephone, cellular phone, radio phone, data entry terminal, etc. (different types of communication access devices). Transmission costs associated with customer defined criteria include customer preference for particular types of networks, encryption security, and/or priority of transmission such as transmit in real time or in a store and forward format as defined in the customer's message.

A software defined network may be used to maintain quality (e.g., upon detection of degradation in quality, the bandwidth of the transmission may be widened in accordance with or prioritization of transmission instructions). If data packets do not arrive quick enough, then quality may be enhanced by increasing the bandwidth within predetermined bandwidth parameters on account of other voice data users.

Another embodiment of the application of this invention concerns security. A calling party may prefer that the transmission take place over a secure, dedicated line, but does not is care about the route taken by the acknowledgment or reply to the transmission. As a result, the acknowledgement or reply may be routing over non-dedicated lines and through any communication networks, even from among selected networks of the calling party's choosing. For instance, the calling party may want the acknowledgement or reply to be routed over either cellular or computer network services.

10

In accordance with the invention, such customer preferences may be found in the data base associated with the calling party and interpreted by the central local nodes. The central local nodes then instruct nodes responsible for the routing back of the reply or acknowledgement to follow the desired preference.

Another example of the application of this invention relates to a customer's preference that a telecopier message be transmitted immediately instead of in delayed batch format or vice versa. The telecopier message is sent to a central local node (at the origin). After initializing the system, i.e., setting a carrier default **90**, checking customer preferences for an operator of a service provider **92** and checking customer preference for selecting the desired service **94**, the central local node determines **96** if there are any more central local nodes (CLN) from a least cost routing (LCR) table, which contains a list of central local nodes connected with service providers of different networks and their costs for providing service.

If there are more central local nodes, the next one is selected **98**. A determination **100** is made as to whether peak or off peak rates apply by basing it on the current time. Reference to a data base table **102** may be made to determine the average call length of service to the location by the customer to help figure out the most cost efficient route based on history of usage. A least cost routing comparison **104** is made to determine whether the new central local node's connection to the service provider offers the more favorable rate based on the average length of communication that what was being offered through the previously considered central local node. If better, the newly considered central local node (and its associated service provider) is selected. If worse, the previously selected central local node (and its associated service provider) will remain selected.

This process is repeated **108** for each central local node and thereby each service provider. When done, the format of the call, the appropriate service provider, network and time of day are selected for sending the transmission to the selected central local node **110** and the billing information is updated **112**.

By selecting the appropriate network, it may be ascertained that it is less expensive to transmit the telecopier message in digital form over a data network than to transmit the telecopier message via voice callback format through the long distance carriers. Thus, the data network may be the network of choice for purposes of selecting the least cost between nodes. On the other hand, the central local node should give priority to the customer's preferences, which could mean that the transmission be routed through the most secure route which may not be the data network Instead, a secure transmission would be through a different routing and would result in an increase in transmission cost.

FIG. **6** shows a flow chart for establishing a synchronized connection of both call legs, that is, synchronizing the completion of callback and called party communications by selecting specific system time and speed of callback time. A user is allowed to stay on a line or hang up to wait for a callback while the routing unit time the completion of both communications from the routing unit to the calling party access number and the called party access number and ensures that both occur simultaneously or according to cost efficiency of transaction. The routing unit checks an internal data base to determine how long to wait before commencement of opening communications with both so as to ensure synchronization of the callback and called party calls. This may be based on the historical performance of placing the callback and called party calls or placing a data call or tracking down a party.

US 7,724,879 B2

11

A routing unit initially receives the first leg **120** (location, city, destination) of the calling party and the second leg **122** (location, city, destination) of the called party and then looks up in a status call back table in memory **124** for the least estimated connection time. The difference **126** is calculated between the connection times of the two legs and the leg with the longer connection time needed is dialed **128**. A timer **130** is set to the difference and counts down to zero **132**.

When the counting down is completed, the timer triggers the actuation to open communication with the leg with the shorter connection time **134** to establish the call **136**. If a called party is to be called that is not found in the status call back table in memory **124**, then the actuation to open communication takes place in the sequence of the status call legs first and then the other leg. The average connection times are then stored in the table in memory **124** for future synchronization of the two legs. The table is continuously updated every time calls are placed. The average connection times for both legs and the service providers that are available for connection to the called party location and city codes are stored in the table for retrieval upon demand.

Another aspect of the invention concerns blocking the channels so no other incoming calls can interrupt during the time the routing unit performs the callback and called party calls. The intercept unit only releases the blocked channel a few seconds before the time specified in the history of completion of the callback and called party calls. Alternatively, the time delay may be based on a fixed minimum time period common for placing those types of calls. For instance, if a long distance call takes 10 to 15 seconds depending upon the called party, the time delay period that is set could always be 9 or 10 seconds under the time required to make that call. Thus, there is only a short time period during which an incoming call can interrupt the routing unit's synchronization of the completion of the callback and called party calls. It should be noted that the data base checked by the intercept unit may not be the same data base checked by the routing unit, although their contents could be the same. Such call blocking features are commercially available from VoiceSmart in software and hardware under the designation transparent local node (TLN) and hotel local node (HLN). By blocking such incoming calls, service providers no longer face the risk of bearing the expense of completing the second callback leg if the first callback leg becomes busy due to an incoming call.

FIGS. **7A-7G** exemplify different techniques for efficient routing communications in accordance with the invention. Access devices **150** and **156** (FIGS. **7A-7G**) and nodes **152** (FIGS. **7A-7C**, **7E-7F**), **154** (FIGS. **7A-7G**) and **160** (FIG. **7C**) on a network are shown, but each node may be located in the same or different geographical region or country. The access device **150** may have an intercept capability to render the ensuing routing connections transparent to the users. Node **158** (FIG. **7B**) represents an access device on a different network. For purposes of example, links **170** (FIGS. **7A-7G**) and **174** (FIGS. **7A-7G**) may be considered voice transmission lines and links **172** (FIGS. **7A-7C**, **7F**) and **173** (FIG. **7D**) may be considered data transmission lines. Link **176** (FIG. **7B**) may be a paging or cellular line. Links **178** (FIGS. **7E** and **7G**) and **180** (FIG. **7E**) may be data lines. Links **182**, **184** and **186** (FIG. **7F**) may also be data lines. Each node may perform the function of terminating the call, such as when authorization is not forthcoming for carrying out the transaction.

FIG. **7A** shows that nodes **152** and **154** effecting communication with their respective access devices **150** and **156**, as would be done for simultaneous callback Initially, the initiator access device **150**, transmits its identification and that of the other access device **156** to node **152**. Node **152** requests

12

node **154** to make an inquiry on the availability of access device **156**. If available, then callback is made over respective links **170**, **174**, preferably for simultaneous communication. The two callbacks are bridged over link **172**. Nodes **152** and **154** convert voice transmissions into data transmission and vice versa so that data transmissions travel between nodes **152** and **154** and voice transmissions travel from the access devices to the associated nodes **152**, **154**. Links **170**, **172** and **174** may handle voice or data communications.

FIG. **7B** works in the same way as in FIG. **7A**, except that node **154** pages the called party via paging device **158** over paging network **176**. Once paged, the called party calls node **154** through access device **156** and communication is established by bridging over link **172**. During the interim between paging of the called party and the calling to the node **154** by the called party through the access device **154**, the access device **150** may either be waiting for communication to be established with node **152** or be called back by node **152** after node **152** is advised that the access device **156** has contacted the node **154**.

FIG. **7C** is the same as that of FIG. **7A**, except that an additional node **160** between nodes **152**, **154** is shown to illustrate that the routing between nodes **152**, **154** may not be direct, and also showing that access device **150** is communicating directly with node **152** rather than as a result of callback as in FIG. **7A** and using two different data links **172** and **173**.

FIG. **7D** shows that communication may be through a single node **154**, rather than through two nodes as in FIGS. **7A-7C** as in case where access device **150** is a computer that has direct access to data link **172**

FIG. **7E** shows also that communication may be through a single node **152**, rather than through two nodes, but also shows that such communication is established after access device **150** communications with node **154** say through E-mail that communication is desired with access device **156**. Instead of routing the transmission through node **154**, node **154** signals to node **152** to make contact with access devices **150** and **156** directly.

FIG. **7F** shows a callback type of arrangement in which a request for establishing communication from access device **150** to access device **156** is made through one kind of network, but the actual callback is done over a different kind of network, although both kinds of networks share the same nodes **152**, **154**. As an example, the request could be through a data network **182**, **184**, **186** and the callback could be through two voice links **170**, **174** from respective access devices **150**, **156**, with the two voice links being bridged by a data link **172**. The nodes **152**, **154** convert voice transmissions into data transmissions and vice versa as desired.

FIG. **7G** is the same as FIG. **7E**, except that node **154** also performs the function of node **152** in FIG. **7E** and thereby routes the transmissions through itself. In this case, a request for establishing communication with access device **156** from access device **150** is effected over a data link **178**, such as through E-mail. In response, node **154** calls both access devices **150**, **156**, preferably so that each is contacted simultaneously, over a different network such as over voice lines **170**, **174**.

In each of these examples of FIGS. **7A-7G**, billing is handled transparent to the parties using the access devices **150**, **156**. Each of the nodes are in contact with a central node (or network of central nodes) that must clear the transaction before the termination nodes take action through a global authorizer. Once the transaction cleared, an authorization code is provided to the node. The authorization code may

**13**

either be forwarded to some other node at the time a request is made to establish communication or may be in response for such from that other node.

The central node, which includes the global authorizer, would check the total open credit or debit for the originating node, check for patterns of fraud, check for rights to terminate communication early based on available credit, and check the calling party credit standings with third parties. Based on the results of such checking, the global authorizer of the central node either approves or disapproves of the proposed transaction. Once the transaction is complete, the node responsible communicates such completion to the central node, which then updates account information accordingly. If a node is being shut down, the central node also communicates such shutdown to all other nodes so that they remove the shutdown node from the stored routing table of available nodes.

FIG. **8** shows a central local node A interacting with a calling party access device interface and a global network of high capacity data networks. Access devices may communicate with central local nodes directly or through intercept devices which direct the communication to the central local node. Access devices are exemplified by telephones, pagers, cellular phones, laptops, facsimile machines, multimedia computer workstations, etc.

The subscriber access device interface includes communication networks such as digital and analog telephone, paging and cellular, and data. The central local node includes an authorizer, converters for each communication network, a main processor and router, a main data base, compression and coding system and decompressing and decoding system. The global networks of high capacity data networks include the internet, frame relay and digital and analog voice lines.

The authorizer is responsible for providing clearing transactions to provide authorization for making communication. The authorizer checks with a main data base within the central local node to determine whether the subscriber's credit is good and to what extent to ensure that service providers get paid. The data base may contain a history of the subscriber's usage and outstanding unpaid balance and other information relating to credit history. The main data base's information may be updated from information in other nodal data bases and vice versa, including that of the central node, which should contain the most current information and whose global authorizer may be responsible for authorizing all transactions in advance. By the same process, the global authorizer can check on the creditworthiness of service providers if the service providers will be responsible for paying each other.

The converters convert the form of the communication to suit the particular network over which the communication will be routed, e.g., voice into data, etc. The main processor and router is responsible for checking with the main data base to determine which service providers and communication networks to utilize and to access circuitry to compress or decompress the communications as needed and to access circuitry to code or decode the communications for security purposes.

The main processor and router route the communications through appropriate converters if necessary to suit the network being utilized for routing, i.e., internet, frame relay and ATM, or digital and analog voice lines. The main processor and router also direct the communication to the ultimate destination, i.e., access devices of the called party. In so doing, other central local nodes B or C may be used for part of the routing or else route directly to the access devices via the associated intercept if any for the access device. These intercept devices are also for directing communications

**14**

Converters are available conventionally, such as Texas Instrument digital signal processors which convert voice to data and vice versa. Intercepts are available from VoiceSmart by ordering TLN or HLN and are available conventional from phone companies. The intercept may be part of or separate from the access devices. The intercept evaluates whether savings may be achieved by routing to a node and, if so, routes the transmission to the central local node A of FIG. **8** and identifies the subscriber and called party or service type.

The node receiving the routing from the intercept polls other nodes to trace the called party number or identification address. In this manner, the main processor and router of the node serves as an interrogator that interrogates the availability of the called party number or identification address. The node accesses a main data bank to check the communication network, call format and user preferences to determine the best connection between locations **150** and **156** of FIGS. **7A**-**7G**. The node, through its authorizer, checks whether completing the routing of the transmission is authorized and obtains an authorization code from the global authorizer at the central node. The node converts the transmission if necessary for compatibility and records billing information to ensure proper end user billing. Also, the node updates user statistical usage and access for future use. Each of these tasks that are performed by the node are carried out in a manner that is transparent to the calling party.

FIG. **9** is a variation of that of FIG. **1**, but shares the same components that are identified by the same reference numerals. Additional two-way direct link connections **46**A, **46**B, **46**C, **46**D and **46**E are included. For instance, one route for sending a request as to availability may be from the calling party access device **12** to the local access node **18** either directly or through the intercept **16** and then directly to either the communications network **10**, the data network **20** or another network **200** such as a cellular network, ATM, and/or frame relay. The central switching unit **22** then receives the request from the network as to availability to check on the availability of the called party access device **14**. Once the availability becomes known, an appropriate signal may be sent directly back to the central local node **18** either backtracking through the same route or through the second central local node **24** to either the communications network **10** or the data network **20** to thereafter reach the local access node **18**, Note that the second central local node **24** may be considered a local access node for the called party access device **14**.

A central local node global authorizer **220** is shown to which permission must be obtained by confirming authorization requests before routing connections between the calling and called parties may take place. This global authorizer **220** may be part of the central node to which all the central local nodes are in communication. In FIG. **8**, for instance, the connection from the main data base to the other node data bases would include connection with the central node and thereby with this global authorizer. Authorization requests would be sent to the global authorizer **220** via the applicable one or more of the networks **10**, **20**, **200**.

All the routing paths of FIGS. **7A** to **7G** are applicable to the block diagram of FIG. **9**. Also, the representation of the interaction of the central local node with various networks as shown in FIG. **8** is applicable to FIGS. **1** and **9**.

FIG. **9** shows some links as bi-directional lines and others as two single-directional lines in opposite directions. This was done for convenience and is in no way intended to be limited to one form or the other. Routes may be through any path available, except that the routing through links **53**A, **53**B and **53**C only arises if calling location **48** communicates in a

US 7,724,879 B2

**15**

manner compatible with the applicable one of the networks **10**, **20** or **200**. Otherwise, routing will have to be done through the central local node **18**.

If the calling party location uses a laptop computer and thus connects directly with the data network **20** and bypasses the central local node, the path of communication would still pass through either the central office **22** or the central local node **24** before reaching the called party access device **14**. At the central office **22** or the central local node **24**, therefore, the applicable billing information may be recorded.

While intercept **16** and central local node **18** are shown as separate units, they may be combined together. Similarly, while the central office **22** and central local node **24** are shown as separate units, they may be combined together. By being combined together, a unitary device would provide the functions of both.

While the foregoing description and drawings represent the preferred embodiments of the present invention, it will be understood that various changes and modifications may be made without departing from the spirit and scope of the present invention.

Thus, while there have shown and described and pointed out fundamental novel features of the invention as applied to a preferred embodiment thereof, it will be understood that various omissions and substitutions and changes in the form and details of the devices illustrated, and in their operation, may be made by those skilled in the art without departing from the spirit of the invention. For example, it is expressly intended that all combinations of those elements and/or method steps which perform substantially the same function in substantially the same way to achieve the same results are within the scope of the invention. Moreover, it should be recognized that structures and/or elements and/or method steps shown and/or described in connection with any disclosed form or embodiment of the invention may be incorporated in any other disclosed or described or suggested form or embodiment as a general matter of design choice. It is the intention, therefore, to be limited only as indicated by the scope of the claims appended hereto.

What is claimed is:

**1**. A method for communication between two access devices via one or more networks, comprising the steps:

receiving a transmission in a first format through a first communication network from a first access device, the first format comprising a telecommunication protocol for establishing and transmitting voice communication for a phone call in one of a digital telephone network, an analog telephone network, and a cellular network;

performing a first conversion converting the transmission from the first format to a second format, the second format being an internet protocol;

**16**

sending the converted transmission through a second communication network, the second communication network being a data network, for reception by a second access device; and

performing a second conversion further converting the converted transmission from the second format to a further format suitable for the second access device, wherein the first access device and the second access device comprise telecommunication nodes, and said further format comprises said first format or another telecommunication protocol.

**2**. The method of claim **1**, wherein the transmission is sent from the first access device serially to a first central node, the data network, a second central node, and the second access device.

**3**. The method of claim **1**, wherein the transmission is related to establishing or transmitting voice communication for a phone call from a calling party connected to the second access device to a called party connected to the second access device.

**4**. The method of claim **1**, wherein the first communication network is one of an analog telephone network, a digital telephone network, and a cellular network.

**5**. The method of claim **1**, wherein a calling party is connected to the first access device for transmitting and receiving voice communication for a phone call and a called party is connected to the second access device for transmitting and receiving the voice communication for the phone call.

**6**. The method of claim **1**, wherein the second conversion is performed at the second access device.

**7**. The method of claim **1**, wherein said second access device is connected to a central office of a telecommunication network.

**8**. The method of claim **1**, further comprising the step of selecting a route for the transmission based on at least one criteria defined by user preference.

**9**. The method of claim **8**, wherein the at least one criteria comprises a specified level of transmission quality.

**10**. The method of claim **8**, wherein the at least one criteria comprises credit availability of a calling party.

**11**. The method of claim **8**, wherein the at least one criteria comprises cost of routing.

**12**. The method of claim **8**, wherein the transmission comprises execution of a call setup procedure.

**13**. The method of claim **1**, further comprising the step of storing at least one of subscriber information, rate schedules, and call details.

**14**. The method of claim **1**, wherein the transmission is related to a fax transmission.

**15**. The method of claim **1**, wherein the transmission comprises signaling messages.

\*   \*   \*   \*   \*